Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/13/2018 09:12 AM CST

State of Nebraska, appellee, v.
Michael W. McCurdy, appellant.

___ N.W.2d ___

Filed January 30, 2018.    No. A-17-061.

1.  **Rules of Evidence: Appeal and Error.** When the Nebraska Evidence
    Rules commit the evidentiary question at issue to the discretion of the
    trial court, an appellate court reviews the admissibility of evidence for
    an abuse of discretion.
2.  **Trial: Rules of Evidence.** A trial court exercises its discretion in deter-
    mining whether evidence is relevant and whether its prejudicial effect
    substantially outweighs its probative value.
3.  **Trial: Expert Witnesses: Appeal and Error.** An appellate court reviews
    a trial court's ruling to admit or exclude an expert's testimony for abuse
    of discretion.
4.  **Judgments: Words and Phrases.** An abuse of discretion occurs when a
    trial court's decision is based upon reasons that are untenable or unrea-
    sonable or if its action is clearly against justice or conscience, reason,
    and evidence.
5.  **Rules of Evidence.** Under Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402
    (Reissue 2016), irrelevant evidence is inadmissible.
6.  **Rules of Evidence: Words and Phrases.** Under Neb. Evid. R. 401,
    Neb. Rev. Stat. § 27-401 (Reissue 2016), relevant evidence means evi-
    dence having any tendency to make the existence of any fact that is of
    consequence to the determination of the action more probable or less
    probable than it would be without the evidence.
7.  **Evidence.** Relevancy requires only that the degree of probativeness be
    something more than nothing.
8.  **Rules of Evidence.** Under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403
    (Reissue 2016), even relevant evidence is properly excluded if its
    probative value is substantially outweighed by its potential for unfair
    prejudice.

9. **Motions to Suppress: Constitutional Law: Appeal and Error.** In reviewing a motion to suppress a statement made to law enforcement based on the claimed involuntariness of the statement, an appellate court applies a two-part standard of review. With regard to historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.

10. **Miranda Rights: Waiver: Proof.** If a defendant seeks suppression of a statement because of an alleged violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the State must prove that the defendant validly waived his or her *Miranda* rights by a preponderance of the evidence.

11. **Miranda Rights.** The rule established in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions.

12. **Constitutional Law: Police Officers and Sheriffs.** The U.S. Constitution does not require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.

13. **Motions for Mistrial: Appeal and Error.** The decision whether to grant a motion for mistrial is within the discretion of the trial court, and an appellate court will not disturb the ruling on appeal in the absence of an abuse of discretion.

14. **Trial: Prosecuting Attorneys.** In assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper.

15. **Trial: Prosecuting Attorneys: Juries.** A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.

16. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Appeal from the District Court for Lancaster County: Darla S. Ideus, Judge. Affirmed.

Robert W. Kortus, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Pirtle, Riedmann, and Arterburn, Judges.

Arterburn, Judge.

## I. INTRODUCTION

Michael W. McCurdy was convicted by a jury of three counts of first degree sexual assault of a child, one count of first degree sexual assault, and one count of intentional child abuse. He appeals from his convictions here. On appeal, McCurdy assigns numerous errors, including that the district court erred in making certain evidentiary rulings, in overruling his motion to suppress the statement he made to law enforcement, and in denying his motion for a mistrial after the State committed misconduct during its closing argument. McCurdy also alleges that there was insufficient evidence to support his conviction for first degree sexual assault. Upon our review, we affirm McCurdy's convictions.

## II. BACKGROUND

The State filed a second amended information charging McCurdy with five separate counts: three counts of first degree sexual assault of a child, one count of first degree sexual assault, and one count of intentional child abuse. Each of the charges stemmed from the reports of the eldest daughters of McCurdy's ex-girlfriend that McCurdy had been sexually abusing them for years.

Count I of the second amended information alleged that McCurdy, being 19 years of age or older, did subject J.U., a person of less than 12 years of age, to sexual penetration. Count II alleged that McCurdy, being 25 years of age or older,

did subject J.U., a person who was at least 12 years of age but less than 16 years of age, to sexual penetration. Count III alleged that McCurdy subjected J.U. to penetration without her consent or at a time when McCurdy knew or should have known that J.U. was mentally or physically incapable of resisting or appraising the nature of his conduct. Count IV alleged that McCurdy, being 25 years of age or older, did subject K.O., a person who was at least 12 years of age but less than 16 years of age, to sexual penetration. Count V alleged that McCurdy knowingly and intentionally caused or permitted J.U. and/or K.O. to be placed in a situation that endangered their lives or physical or mental health, or placed them in a situation to be sexually abused.

A jury trial was held in October 2016. At the trial, the State's key evidence was the testimony of both J.U. and K.O. Because of the importance of this testimony, both to the State's case in chief and to the issues raised in this appeal, we outline this evidence in some detail.

J.U. was 18 years old at the time of the trial. She testified that McCurdy has been in her life for as long as she can remember. J.U.'s mother and McCurdy used to be in a long-term romantic relationship, and they share three children together. J.U. testified that McCurdy had been sexually abusing her since she was in middle school. J.U. indicated that since the sexual abuse began, she and her family, including McCurdy, had lived in four different houses. She used these houses to organize her testimony about the years of sexual abuse.

J.U. lived in the "yellow house" from the time she was 5 years old until she was almost 10 years old. While she lived there, she and her younger sister, K.O., shared a bedroom in the attic of the house. One day, when J.U. was approximately 9 years old, she was alone in the bedroom when McCurdy entered the room. J.U. testified, "[H]e came in the room and started taking my pants off and then had intercourse." J.U. testified that after this initial incident, McCurdy would come into her bedroom three to four times per week in order to have

sexual intercourse with her. She testified that she would tell McCurdy "no" and push him away, but that she was unable to stop McCurdy from having sexual intercourse with her. J.U. testified that she did not tell anyone what was happening because she was afraid she would get into trouble and no one would believe her.

J.U. and her family next moved into the "white house." They resided in this house from the time J.U. was 10 years old until she was 13 years old. While J.U. and her family lived in the white house, McCurdy continued to have sexual intercourse with J.U. three to four times per week in her bedroom. She testified that she continued to tell McCurdy "no," but that she did not push him away anymore. She explained that even if she tried to push him away, he would "still do it anyway." J.U. continued to keep the abuse a secret because she was scared.

J.U. and her family moved into the "blue house" when she was 13 years old. They lived at that house until J.U. was almost 15 years old. At the blue house, the abuse continued. J.U. testified that by this time, McCurdy was no longer in a romantic relationship with her mother; however, he continued to reside with the family. J.U. testified that McCurdy continued to have sexual intercourse with her three to four times per week, both in her bedroom and occasionally in her mother's bedroom. In addition, while they were living in the blue house, McCurdy began to rub J.U.'s vagina with his hands and put his mouth on her vagina. J.U. described that McCurdy would put lotion all over her body, including on her breasts, her buttocks, and her vagina. J.U. indicated that she had stopped saying "no" to McCurdy, "[b]ecause he still did it anyway." She continued to keep the abuse a secret.

When J.U. was almost 15 years old, she, her mother, and her siblings moved into "the Sandstone house." McCurdy did not reside at this residence; however, he stayed overnight at the home on a regular basis, oftentimes without J.U.'s mother's knowledge. At the Sandstone house, J.U. slept in

the basement on a futon. When McCurdy would sleep at the Sandstone house, he would typically sleep with J.U. on the futon. McCurdy had sexual intercourse with J.U. three to four times per week in her basement bedroom. In addition, McCurdy put his hands and mouth on her vagina. J.U. no longer resisted McCurdy's actions.

In 2014, just prior to J.U.'s turning 16 years old, she became pregnant. J.U. testified that McCurdy was the father of the baby. In fact, she testified that she had never had sexual intercourse with anyone other than McCurdy. When McCurdy discovered that J.U. was pregnant, he told her to tell her mother that someone else was the father. J.U. testified that she followed McCurdy's directions and "ma[d]e up a name" to tell her mother. J.U.'s pregnancy did not result in a live birth.

During the summer of 2015, when J.U. was 17 years old, she became pregnant for a second time. The parties stipulated at trial that McCurdy was the father of J.U.'s baby. J.U. testified that when McCurdy found out she was pregnant, he instructed her "[t]o make up a name again" to tell her mother. However, on August 7, 2015, J.U. told her mother that she was pregnant with McCurdy's baby. J.U.'s mother then called police.

K.O. was 16 years old at the time of the trial. She testified that she has known McCurdy for her entire life. She also testified that McCurdy had been sexually assaulting her since she was approximately 10 years old. Like J.U., K.O. organized her testimony about the years of sexual abuse using the houses where she and her family had lived in the last few years.

When K.O. lived in the blue house, she was between the ages of 11 years old and 13 years old. She testified that while she lived in this house, McCurdy gave her a video game system as a present. He took her out of school so that they could play the game together all day and into the night. McCurdy then told K.O. to sleep in his bed so the younger children did not wake her up. McCurdy laid down with K.O. in the bed. K.O. testified that while they laid together, he attempted to "put[] his penis in [her] shorts." She pulled away from him

and nothing further happened on this occasion. Subsequently, however, McCurdy asked K.O. to rub his penis and "scratch[]" his "balls." He would sometimes tell her to use lotion when she was touching his penis. Eventually, McCurdy put his penis in K.O.'s vagina. He then continued to have sexual intercourse with her twice per week. McCurdy also put his fingers in K.O.'s vagina.

K.O. testified that she tried to resist McCurdy by pushing him away or trying to get away from him. She also told him "no." She indicated that sometimes she was able to successfully resist his actions. However, other times, McCurdy would "punish" her for her resistance. Such punishment included using his fingers to "[g]o higher up . . . in [her] vagina" to cause her pain. Additionally, K.O. testified that McCurdy would be "violent" with her sometimes. He would slap her, punch her, choke her, and hold her arms down.

K.O. testified that she did not tell her mother what was happening because she did not think her mother would believe her. She also testified that before McCurdy began abusing her, she observed J.U. and McCurdy having sexual intercourse in her mother's bedroom.

When K.O. and her family moved to the Sandstone house, K.O. was 13 years old. K.O. testified that at the Sandstone house, the sexual intercourse and sexual contact continued. K.O. indicated that the sexual contact included McCurdy rubbing lotion all over her body. At the Sandstone house, McCurdy had sexual intercourse with K.O. approximately twice every other week. K.O. believed that the abuse happened less often at the Sandstone house because she continued to resist McCurdy and actively tried to stay away from him.

K.O. described three specific instances of sexual contact at the Sandstone house that she remembered. First, she described one occasion where McCurdy attempted to have her put her mouth on his penis, but she successfully resisted him. Then, she described an occasion where McCurdy put his fingers in her vagina while they were in the living room watching a

movie with her younger siblings. K.O. indicated that she and McCurdy were under a blanket. Finally, she described an incident where she resisted McCurdy and he got mad and put his hands around her neck.

K.O. testified that she did not tell her mother about what was happening because she did not think her mother would believe her. K.O. admitted that she had lied to her mother about other things. K.O. did not tell her mother about the abuse until after J.U. had reported her experiences to police.

The State offered evidence in addition to J.U.'s and K.O.'s testimony. Such additional evidence included DNA evidence from the Sandstone house, the testimony of an expert witness concerning behaviors of child sexual assault victims, and a recording of an interview between law enforcement and McCurdy which was conducted just prior to McCurdy's arrest. The substance of this evidence will be detailed in our analysis below. The State also offered into evidence numerous photographs of J.U. and K.O. which were located on McCurdy's cellular telephone and on the family's computer under a user account titled "Mike." Some of these photographs had comments of a sexual nature electronically superimposed on them.

McCurdy did not testify at trial, nor did he offer any evidence in his defense. However, throughout the cross-examination of the State's witnesses and during closing arguments, McCurdy's counsel indicated that McCurdy did not dispute that he and J.U. engaged in sexual intercourse after she turned 16 years old. McCurdy contended that his sexual relationship with J.U. at that time was consensual. McCurdy did dispute that he had ever had sexual intercourse with K.O. He also disputed that he had sexual intercourse with J.U. prior to her turning 16 years old. Much of McCurdy's defense involved attacking the credibility of J.U. and K.O. during their cross-examinations. McCurdy pointed out numerous inconsistencies between J.U.'s and K.O.'s trial testimony and their prior statements about the sexual abuse.

After hearing all of the evidence, the jury convicted McCurdy of all five counts alleged in the second amended information. The district court subsequently sentenced McCurdy to a total of 95 to 115 years' imprisonment.

McCurdy appeals his convictions here.

## III. ASSIGNMENTS OF ERROR

On appeal, McCurdy assigns five errors, which we consolidate to four errors for our review. He first argues that the district court erred in making certain evidentiary rulings. Specifically, he asserts that the court erred in failing to further redact the laboratory report concerning DNA testing that was submitted into evidence. He also asserts that the court erred in permitting the State's expert witness to testify concerning the credibility of the victims. Second, McCurdy argues that the district court erred in finding that his statement to law enforcement was knowingly and voluntarily given and in consequently overruling his motion to suppress that statement. Third, he argues that the district court erred in overruling his motion for a mistrial after the State committed prosecutorial misconduct during its closing argument. Finally, McCurdy argues that there was insufficient evidence to convict him of count III, first degree sexual assault.

## IV. ANALYSIS

### 1. EVIDENTIARY RULINGS

On appeal, McCurdy alleges that the district court erred in allowing "[i]nconclusive, [n]o-[c]onclusion DNA [t]esting [r]esults" into evidence, brief for appellant at 21, and in allowing the State's "[e]xpert [w]itness to [t]estify as to the [c]redibility and [a]ccuracy" of the victim's in-court testimony, *id.* at 25. Upon our review, we do not find that the court erred in allowing into evidence either the DNA results or the testimony of the expert witness.

### (a) Standard of Review

[1-3] When the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court,

we review the admissibility of evidence for an abuse of discretion. *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015). A trial court exercises its discretion in determining whether evidence is relevant and whether its prejudicial effect substantially outweighs its probative value. *Id*. In addition, an appellate court reviews a trial court's ruling to admit or exclude an expert's testimony for abuse of discretion. *State v. Braesch*, 292 Neb. 930, 874 N.W.2d 874 (2016).

[4] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Johnson, supra*.

### (b) DNA Evidence

Prior to the trial, McCurdy filed a motion in limine requesting that a laboratory report which provided the results of DNA testing completed on items taken from the Sandstone house be redacted prior to being submitted into evidence and shown to the jury. Specifically, McCurdy asked that the portions of the report which discussed "uninterpretable" or "inconclusive" results be redacted because such information was not relevant. At a hearing on McCurdy's motion in limine, the State agreed to redact much of the information McCurdy objected to. However, the parties disagreed about whether certain information contained in the report had to be redacted. Included within the disputed information were portions of the report's appendix, which detailed the known DNA profiles for McCurdy, J.U., and K.O., and which listed the specific alleles that were taken from samples of objects located in the Sandstone house. In particular, McCurdy asked that the State redact the list of alleles found within item 5C, which was K.O.'s mattress. Ultimately, the district court allowed this information to remain in the report when it was submitted to the jury.

During the trial, the State offered the testimony of the technician who performed the DNA testing in this case, Heidi Jo Young Ellingson. During her testimony, Ellingson provided a

brief explanation of how DNA testing is performed. In addition, she explained the results delineated in her report. Ellingson indicated that K.O.'s DNA was only found on one item tested, item 5C, which was K.O.'s mattress. In comparison, Ellingson testified that J.U.'s and McCurdy's DNA was found together on multiple items. The DNA report indicates that on item 5C, "A mixture of at least three individuals was detected in which a major female contributor could be determined." The major female contributor was identified as K.O. The report also indicates that McCurdy was excluded as a major contributor to the DNA on K.O.'s mattress.

Ellingson went on to explain the appendix on the report. The appendix details the specific alleles that were found on each item tested. The alleles found on the tested items can then be compared to the reference samples provided by McCurdy, J.U., and K.O. Ellingson reiterated that the appendix demonstrates that the DNA testing revealed multiple items with J.U.'s and McCurdy's DNA together and only one item with K.O.'s DNA. A careful review of the appendix, as it relates to K.O.'s mattress, reveals that the alleles found on the sample from K.O.'s mattress match K.O.'s DNA profile at each locus. Some of the alleles also match McCurdy's DNA profile. However, McCurdy's full DNA profile was not found on K.O.'s mattress. His known alleles are not found at some loci, and alleles not matching either K.O. or McCurdy are found at other loci.

On appeal, McCurdy alleges that the district court erred in failing to redact the information about item 5C which was included in the DNA report's appendix. McCurdy argues that this information was not relevant and, furthermore, "could be interpreted to show the presence of [his] DNA on K.O.'s mattress, [and] that result could be prejudicial to the defense." Brief for appellant at 24. Upon our review, we do not find that the district court abused its discretion in failing to further redact the DNA report to exclude the results of the testing of K.O.'s mattress.

[5-7] Under Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 2016), irrelevant evidence is inadmissible. *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015). Under Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 2016), relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *State v. Johnson, supra*. Relevancy requires only that the degree of probativeness be something more than nothing. *State v. Johnson, supra*. We find that the evidence demonstrating that K.O.'s DNA is present on the mattress she said she slept on in the basement of the Sandstone house to be at least minimally relevant to the issues presented at trial. Such evidence corroborates K.O.'s testimony that she slept in the basement in her bed while J.U. and McCurdy slept in J.U.'s bed.

[8] However, under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), even relevant evidence is properly excluded if its probative value is substantially outweighed by its potential for unfair prejudice. *State v. Johnson, supra*. McCurdy alleges that the evidence contained in the appendix regarding K.O.'s mattress "could be prejudicial" to him if the jurors utilized the information to try and conclude that McCurdy's DNA was present along with K.O.'s DNA on the mattress. Brief for appellant at 24.

As we explained above, the DNA report specifically indicates that K.O. was identified as a major contributor to the DNA sample taken from her mattress. It also specifically indicates that McCurdy was excluded as a major contributor to the DNA sample on the mattress. Ellingson's testimony about K.O.'s mattress does not hint or suggest that McCurdy's DNA could also be on the mattress. Her testimony was limited to the conclusion that K.O.'s DNA was found on the mattress. McCurdy's assertion that the jury could have concluded that his DNA was also on the mattress by utilizing the information contained in the appendix is not supported by the evidence and is entirely speculative.

A thorough reading of the information in the appendix reveals that the alleles found on the sample from K.O.'s mattress match K.O.'s DNA profile at each locus. Some of the alleles also match McCurdy's DNA profile. However, McCurdy's DNA profile is not an exact match at each locus. Specifically, McCurdy's DNA profile does not match the sample taken from K.O.'s mattress at six separate loci. If the jurors had done a careful review of the appendix, their analysis should not have prejudiced McCurdy. Rather, the analysis would have revealed that it is not at all clear whether McCurdy's DNA was on the mattress. The DNA on the mattress cannot be definitively linked to anyone but K.O. Moreover, it is entirely speculative to assume that the jurors completed this analysis, especially given the other evidence presented in the report and in Ellingson's testimony, which did not provide any indication that McCurdy's DNA was also present on the mattress.

Although we conclude that the evidence in the report's appendix which demonstrated that K.O.'s DNA was found on her mattress was only minimally probative, we also conclude that the evidence was not prejudicial to McCurdy. This evidence does not link McCurdy to the mattress. As such, we do not find that the district court abused its discretion in failing to further redact the DNA report by omitting item 5C from the appendix.

### (c) Expert Testimony

Prior to trial, McCurdy filed a motion requesting that the district court exclude expert testimony at trial regarding "whether [J.U. could] consent to sexual intercourse with [McCurdy] after she turns 16 if she has been in a sexual relationship with [him] prior to her 16th birthday." A hearing was held on the motion. At the hearing, the State offered the deposition testimony of Barbara Sturgis, Ph.D., a licensed psychologist. Her deposition testimony included a discussion of delayed or partial disclosures by child sexual assault victims. In addition, she discussed the theory of "learned helplessness"

as it relates to child sexual assault victims. McCurdy's primary objection to Sturgis' testimony concerned her discussion of learned helplessness. He argued that this theory had not been adequately studied in human populations, "especially the sub-set at issue in this case which are victims of child sexual assault." Ultimately, the district court determined that Sturgis would not be permitted to testify regarding the learned helplessness theory. However, she was permitted to testify about disclosure patterns in child sexual assault victims.

At trial, Sturgis testified that, in general, "[K]ids don't tell about abuse or sexual abuse right away. When they do tell they don't tell everything and many never tell at all." She explained that there were various reasons for children's delayed or nondisclosure of sexual abuse, including a lack of understanding about what is happening, feelings of guilt or shame, and fear of retribution. In addition, she testified that a child victim of sexual abuse may outwardly appear to be normal and happy.

The State asked Sturgis about the presence of inconsistencies in a victim's various interviews and trial testimony. McCurdy objected to this line of questioning, arguing that the State was attempting to have Sturgis bolster the credibility of J.U. and K.O. The court overruled the objection, and Sturgis testified, generally, about the potential veracity of inconsistent statements:

> The research into this area [sic] certainly consistent statements are highly accurate from one time to the next. Even forgotten statements and reminiscences[,] ones that are remembered the first time not the second time, or not remembered the first time and the second time are also highly accurate in general. And contradictions are at most accurate only half the time because [sic] has to be one way or the other.

Sturgis also testified that she had never met or spoken to J.U. or K.O. She had not read any police reports about this case and was only "[r]oughly" familiar with the facts of the case.

Sturgis indicated that everything that she testified to was based on general theories and knowledge within her field.

On appeal, McCurdy alleges that the district court erred in permitting Sturgis to testify about the veracity of inconsistent statements. He argues that such testimony "ascribes levels of accuracy to a child victim's testimony when that testimony is different than statements made before trial to investigators." Brief for appellant at 30. He also argues that Sturgis' testimony on this topic bolstered the credibility of J.U. and K.O. Upon our review, we do not find that the court abused its discretion in permitting Sturgis' testimony.

The primary purpose of Sturgis' testimony, as limited after McCurdy's pretrial motion in limine, was to provide the jury with background concerning child victims and how they differ from adult victims. The Nebraska Supreme Court has previously approved of the use of the type of testimony given by Sturgis. See, e.g., *State v. Fleming*, 280 Neb. 967, 792 N.W.2d 147 (2010). The court has noted that this type of evidence is helpful because "'"[f]ew jurors have sufficient familiarity with child sexual abuse to understand the dynamics of a sexually abusive relationship," and "the behavior exhibited by sexually abused children is often contrary to what most adults would expect."'" *Id*. at 973, 792 N.W.2d at 154, quoting *State v. Roenfeldt*, 241 Neb. 30, 486 N.W.2d 197 (1992).

McCurdy alleges that the State drifted from Sturgis' discussion about disclosure patterns in child victims of sexual assault when it asked her about the veracity of inconsistent statements. However, a reading of the entirety of Sturgis' testimony reveals that the State's questions about inconsistent statements was merely an extension of Sturgis' previous testimony about how and why child victims report sexual abuse and why they may not report or remember exact details of their abuse. Just prior to the State's specific questions about inconsistent statements, Sturgis testified about why child victims may not be able to recall exact details of each instance of abuse or why they may confuse instances when recalling

the facts years later. Sturgis had also previously testified about why child victims may not disclose certain "icky things" about the abuse when recounting the sexual abuse. When we consider this testimony, along with Sturgis' testimony that child victims may provide inconsistent statements if they are asked different questions in different interviews and that inconsistent statements are not necessarily inaccurate statements, we do not find that Sturgis drifted from the primary purpose of her testimony. All of Sturgis' testimony related to disclosure patterns in child victims.

Moreover, we note that in Sturgis' testimony, she specifically indicated that she had never interviewed J.U. or K.O. and that she knew very little about the actual facts of this case. Nothing in Sturgis' testimony was directed at these particular witnesses, but, rather, her testimony was a discussion of child witnesses in general. At no point did Sturgis ever come close to opining on whether J.U. or K.O. had been sexually assaulted, nor did she ever come close to opining on whether she believed the allegations made by J.U. or K.O.

We find that the district court did not err in permitting Sturgis to testify about the potential veracity of inconsistent statements. McCurdy's assertion on appeal has no merit.

### 2. Motion to Suppress

McCurdy alleges that the district court erred in admitting into evidence McCurdy's interview with law enforcement. He alleges that he did not validly waive his right against self-incrimination prior to making a statement. Upon our review, we affirm the decision of the district court to admit McCurdy's interview into evidence.

### (a) Standard of Review

[9] In reviewing a motion to suppress a statement made to law enforcement based on the claimed involuntariness of the statement, an appellate court applies a two-part standard of review. With regard to historical facts, an appellate court reviews the trial court's findings for clear error. Whether those

facts suffice to meet the constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination. See *State v. Grimes*, 23 Neb. App. 304, 870 N.W.2d 162 (2015).

### (b) Analysis

After J.U. reported to police that McCurdy had been sexually abusing her and that she was pregnant with his child, police went with J.U. to the Sandstone house. When police arrived at the house, they did an initial search to determine if McCurdy was present. They did not find him upon this initial search. However, later, they found McCurdy hiding in the downstairs bathroom. He was hiding in the shower "curled up in a little ball." After the police located McCurdy, he was taken to the police station where he was interviewed by Sgt. Ben Miller.

Prior to Sergeant Miller's asking McCurdy any questions about the sexual assault investigation, he advised McCurdy of his *Miranda* rights. After informing McCurdy of his rights, Sergeant Miller asked him: "Okay, and then knowing your rights in this matter, are you willing to answer some questions or—or make, talk to me about, basically about what's goin' on? That okay with you?" The following exchange between Sergeant Miller and McCurdy then took place:

MICHAEL MCCURDY: I don't know what's going on. I've been sittin' here.

. . . .

[SERGEANT] MILLER: If—if you don't want to, I can't force ya to answer somethin' or talk to me, but in order for us to even talk about, why we're here, I have to let you know these things and it's gotta be okay with you that we, that we talk about it. Okay? And I, I'm just letting you know that it's your choice if you don't wanna know what's going on, that's your prerogative, but I would imagine that you would want to know what, why you're down here. Is it okay if you and I talk?

MICHAEL MCCURDY: It's okay.

[SERGEANT] MILLER: Is that yes?

MICHAEL MCCURDY: Yeah, yes.

[SERGEANT] MILLER: Okay. I'm just gonna have you sign right here. You can read these. These are the quest—these are the things I read you. These are your answers and if that's okay with you, I'll just have you sign right there. It's just saying that I read that to you, you understand those things, and that it's okay for us to have a conversation. And it would just be where, right here . . . .

MICHAEL MCCURDY: . . . You're not gonna tell me why I'm here without signing this?

[SERGEANT] MILLER: Well, you don't have to sign it if you don't want to. I—I'm just . . .

MICHAEL MCCURDY: I don't understand the . . .

[SERGEANT] MILLER: What don't you understand? I'll explain it to you.

MICHAEL MCCURDY: Why do you need, why do you need this?

[SERGEANT] MILLER: It's just a formality that we go through. That's all that it is because you were brought down here in a police car, uhm, I—it's just somethin' that our department has us do. It's all that it is. I pretty much give that to everybody that I talk to. Do you have any questions about that? 'Cause I'd be, I mean I'm, I'm not tryin' to hide anything from you here I'm just, I wanna make sure you understand.

During Sergeant Miller's last statement, McCurdy signed the form acknowledging that he had been read his rights and indicating his decision to speak with Sergeant Miller. Their discussion then continued, as follows:

MICHAEL MCCURDY: I don't know, I just, uhm, I've never been here.

[SERGEANT] MILLER: Okay, and if you have questions just ask me. Okay? I—I will do my best to answer

'em, uhm, I'll, it's important for me, that you understand I—I'll be as honest as I can with you and tell you what I can. There's just some things I, I may not be able to answer for you and I'll tell you that. Okay? Uhm, but whenever I talk to people it's important for me that you understand I'm not here to try to hide things from you. I'm not here to try to lie to you about things. My belief is if, I treat you with respect I hope that you'll do the same to me. Okay? Uhm, because I don't wanna waste your time any more than you probably wanna be wasting my time, and, so as long as, you know, we're good with that things will go, go fairly well here. Okay?

After this exchange, Sergeant Miller began asking McCurdy about the events of that night and about his relationship with J.U. and K.O.'s mother. Then, Sergeant Miller informed McCurdy that J.U. had told police that McCurdy had been sexually abusing her. McCurdy denied ever having sexual contact with J.U. When Sergeant Miller informed McCurdy that J.U. was pregnant again and that DNA testing was going to be conducted to determine the father, McCurdy stated, "I don't have anything else to say."

Prior to trial, McCurdy filed a motion to suppress his statement to Sergeant Miller. A hearing was held on the motion. After this hearing, the district court entered an order noting that the State conceded that any statement McCurdy made after he told Sergeant Miller that he did not have anything else to say should be suppressed as an invocation of McCurdy's right to remain silent. The court found that the remainder of the statement was admissible. Specifically, the court found that McCurdy had knowingly, intelligently, and voluntarily waived his *Miranda* rights:

It is clear to the court that [McCurdy's] statements indicating he did not understand refer to him not knowing why he had been brought to the police station for questioning. Neither party pointed the court to any authority indicating police have to advise a suspect of the nature

of the investigation prior to giving the suspect *Miranda* warnings and/or obtaining a waiver of *Miranda* rights. The court can't say [Sergeant Miller's] refusal to tell [McCurdy] why he was there amounted to coercion. Once [McCurdy] was advised of why he was there, he continued to speak to [Sergeant Miller] and answer questions. Again, [McCurdy] ultimately exercised his right to remain silent making it clear that he understood his rights, the consequences of waiving those rights, and that he could invoke his right to remain silent.

On appeal, McCurdy alleges that the district court erred in denying his motion to suppress the entirety of his statement to Sergeant Miller. Specifically, he asserts that he did not validly waive his *Miranda* rights prior to making a statement. He argues that Sergeant Miller "induce[d]" and compelled him to make a statement by withholding information from him until he agreed to talk. Brief for appellant at 36.

[10,11] *Miranda* warnings are "'"an absolute prerequisite to interrogation" . . . and "fundamental with respect to the Fifth Amendment privilege."'" *State v. Burries*, 297 Neb. 367, 388, 900 N.W.2d 483, 503 (2017), quoting *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). If a defendant seeks suppression of a statement because of an alleged *Miranda* violation, the State must prove that the defendant validly waived his or her *Miranda* rights by a preponderance of the evidence. *State v. Burries, supra*. We look to the totality of the circumstances to determine whether a defendant validly waived his or her *Miranda* rights during an interrogation:

> *Miranda* rights can be waived if the suspect does so knowingly and voluntarily. A valid *Miranda* waiver must be voluntary in the sense that it was the product of a free and deliberate choice and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. In determining whether a waiver is knowingly and voluntarily made, a

court applies a totality of the circumstances test. Factors to be considered include the suspect's age, education, intelligence, prior contact with authorities, and conduct. *State v. Goodwin*, 278 Neb. 945, 956, 774 N.W.2d 733, 743 (2009). "'The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions.'" *State v. Burries*, 297 Neb. at 389, 900 N.W.2d at 504, quoting *Berghuis v. Thompkins*, 560 U.S. 370, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010).

Before questioning McCurdy about the sexual assault allegations, Sergeant Miller read him the following *Miranda* advisements: "You have the right to remain silent, not make any statements, or answer any of my questions"; "[a]nything you may say, can be, and will be used against you in a court of law"; "[y]ou have the right to talk to a lawyer before answering questions and have a lawyer with you during questioning"; and "[i]f you cannot afford a lawyer, you have the right to have a lawyer appointed for you, prior to questioning, at no cost to you." After each statement, Sergeant Miller asked McCurdy if he understood and McCurdy indicated his understanding.

McCurdy acknowledges that he was informed of his *Miranda* rights. However, he asserts that he informed Sergeant Miller that he did not understand what was to happen during the interrogation, nor did he understand why he was there. He further asserts that Sergeant Miller's refusal to inform him of why he was there before he agreed to answer any questions amounted to "unconstitutional inducement." Brief for appellant at 36.

Upon our review of McCurdy's statement to Sergeant Miller, there is no indication that McCurdy did not understand his *Miranda* rights. He indicated a clear understanding of each right as it was read to him. Moreover, only a few minutes after Sergeant Miller began asking McCurdy about his relationship with J.U., McCurdy validly invoked his right to remain

silent and to terminate any further questioning. This action indicates that McCurdy had a clear understanding of his *Miranda* rights.

We agree with McCurdy that Sergeant Miller specifically indicated that he would not explain why McCurdy was present at the police station until McCurdy agreed to talk to Sergeant Miller. However, we disagree with McCurdy's assertion that Sergeant Miller's withholding of that information negated the voluntariness of McCurdy's subsequent statement. Contrary to McCurdy's assertion on appeal, Sergeant Miller did not have to inform McCurdy of the allegations against him in order to ensure that his waiver of rights was voluntarily given. Rather, Sergeant Miller only had to inform McCurdy of his *Miranda* rights and ensure that McCurdy understood those rights.

[12] The U.S. Supreme Court has previously held, "'[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.'" *Colorado v. Spring*, 479 U.S. 564, 576-77, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1987). The Court went on to state, "Accordingly, the failure of the law enforcement officials to inform [the defendant] of the subject matter of the interrogation could not affect [the defendant's] decision to waive his Fifth Amendment privilege in a constitutionally significant manner." *Id.*, 479 U.S. at 577.

Additionally, we note that contrary to McCurdy's assertions during the interview with Sergeant Miller and on appeal, there is evidence to suggest that McCurdy did, in fact, know why he was being questioned before Sergeant Miller informed him of the sexual assault allegations. McCurdy was found hiding in the shower in the basement of the Sandstone house. Before police found him, McCurdy had apparently began steps to wash all of J.U.'s bedding, and when J.U. had spoken to McCurdy prior to talking with police, she had indicated to him that she had done something that would make him hate her.

Given the totality of the circumstances surrounding McCurdy's waiver of his *Miranda* rights and his decision to speak with Sergeant Miller, we find no indication that McCurdy was coerced or induced into making a statement. There is nothing to indicate that McCurdy's will was overborne or that his waiver of his rights was not knowingly and voluntarily given. We affirm the decision of the district court to admit into evidence a redacted version of McCurdy's statement to police.

### 3. Motion for Mistrial

McCurdy alleges that the district court erred in overruling his motion for a mistrial after the State committed prosecutorial misconduct in its closing arguments. Upon our review, we find that the district court did not abuse its discretion in denying the motion for a mistrial.

### (a) Standard of Review

[13] The decision whether to grant a motion for mistrial is within the discretion of the trial court, and an appellate court will not disturb the ruling on appeal in the absence of an abuse of discretion. *State v. Goynes*, 278 Neb. 230, 768 N.W.2d 458 (2009).

### (b) Analysis

During the State's closing arguments, McCurdy objected to the following statements made by the prosecutor:

> You know, [the] State is going [to] digress for a second. People are different and people react to different things. Now [J.U.], you saw her. She is a broken young woman, broken young woman. Not a fighter. He broke her. And when she finally has the courage to say what happened, her worst nightmares came to fruition. Right?
>
> Why don't people report? . . . Sturgis told you, you know, people don't report because they are afraid they are not going to be believed. They are afraid to go through the produces [sic] of getting justice. And you saw that

play out in this courtroom, what that can do to a person.
You saw her called a liar by . . . McCurdy's attorney. You
saw her words twisted.

McCurdy argued that the State's comments were improper
because they insinuated that J.U. should not have had to go
through the legal process and invoked sympathy for J.U. The
prosecutor explained that his comments were merely meant to
explain J.U.'s "demeanor on the stand." The court overruled
McCurdy's objection and allowed the prosecutor to proceed
with his closing. The prosecutor continued to try to explain
J.U.'s demeanor on the stand: "Her words tried to be twisted.
She was bullied. But, you saw this girl, this broken girl there.
The State is asking you to understand why she was like that.
Okay. The fear of people going through the process, and you
understand why."

After the prosecutor finished his argument, McCurdy made
a motion for a mistrial. He argued that the prosecutor commit-
ted misconduct:

> Talking about [J.U.] having to go through the legal proc-
> ess and having to come to court. We believe it is improper
> to allege that she had to come through the legal process
> and go to court and it is an infringement on my client's
> right to a fair trial and demand a jury trial to go through
> the process.
>
> Also, Your Honor, the jury sympathizes, that it is
> unduly prejudicial for the jury to hear that, that they will
> sympathize that she had to go through the process. Also
> gives an inference that he does not have a right to go
> through the trial and make her go through this.

The district court overruled McCurdy's motion for a mistrial.

On appeal, McCurdy asserts that the district court erred in
overruling his motion for a mistrial. McCurdy alleges that the
prosecutor committed misconduct by commenting on his deci-
sion to exercise his right to a jury trial and the effect that deci-
sion had on J.U. He also alleges that the prosecutor improperly
"generated sympathy" for J.U. and criticized defense counsel

when the prosecutor stated that defense counsel had "bullied" J.U. Brief for appellant at 43.

[14,15] Generally, in assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. *State v. Balvin*, 18 Neb. App. 690, 791 N.W.2d 352 (2010). A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct. *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016). But if we conclude that a prosecutor's acts were misconduct, we next consider whether the misconduct prejudiced the defendant's right to a fair trial. *Id*.

Upon our review of the entirety of the State's closing arguments, we do not find that the prosecutor's remarks about J.U.'s struggles with the legal process constituted prosecutorial misconduct. While we agree with McCurdy's general assertion that a prosecutor should not comment about a criminal defendant's decision to exercise his right to a jury trial, we do not find that the prosecutor's comments about J.U.'s struggles improperly referenced McCurdy's right to a trial. Instead, when we read the prosecutor's closing arguments in light of the evidence presented at trial, and particularly in light of J.U.'s direct and cross-examinations, we understand the prosecutor's comments to be an explanation of J.U.'s demeanor on the stand.

During J.U.'s trial testimony, she provided inconsistent answers to questions posed by the State and by defense counsel. In addition, defense counsel brought out multiple inconsistencies between J.U.'s testimony at trial and her statements during previous interviews. Defense counsel accused J.U. of being untruthful and insinuated that she was making up the allegations of sexual abuse. The record reveals that J.U. was very emotional throughout her testimony, and particularly during cross-examination. The prosecutor's comments about J.U. during closing arguments appear to be an attempt to try to rehabilitate J.U.'s testimony and to explain the inconsistencies in her testimony. The prosecutor did not directly comment about McCurdy's decision to go to trial, and how that affected

J.U., but, rather, he commented on J.U.'s struggles with the legal process as a whole. The prosecutor's comment that J.U. was "a broken young woman," in the context of the entire closing argument, does not appear to be a plea to the jury's sympathies. Instead, it appears to be a way of explaining why J.U. may have acquiesced to defense counsel's accusations during the cross-examination.

In light of J.U.'s testimony at trial, we cannot say that the prosecutor's comments about her struggles with the legal process during closing argument were improper. The comments were not meant to mislead or unduly influence the jury. Instead, the comments were an attempt to rehabilitate the testimony of a witness who provided inconsistent testimony. As a result, we do not find that the district court abused its discretion in denying McCurdy's motion for a mistrial.

### 4. Sufficiency of Evidence

McCurdy argues the State failed to present sufficient evidence to convict him of count III, first degree sexual assault on J.U. Upon our review, we conclude that the evidence was sufficient to support the conviction.

### (a) Standard of Review

[16] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017).

### (b) Analysis

Count III of the second amended information alleged that McCurdy committed first degree sexual assault on J.U.

pursuant to Neb. Rev. Stat. § 28-319 (Reissue 2016). Section 28-319(1) provides, in pertinent part:

> Any person who subjects another person to sexual penetration (a) without the consent of the victim, [or] (b) who knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct . . . is guilty of sexual assault in the first degree.

In Neb. Rev. Stat. § 28-318(8)(a) (Reissue 2016), "[w]ithout consent" is defined to mean:

> (i) The victim was compelled to submit due to the use of force or threat of force or coercion, or (ii) the victim expressed a lack of consent through words, or (iii) the victim expressed a lack of consent through conduct, or (iv) the consent, if any was actually given, was the result of the actor's deception as to the identity of the actor or the nature or purpose of the act on the part of the actor.

Notably, § 28-318(8)(c) provides, "A victim need not resist verbally or physically where it would be useless or futile to do so[.]"

McCurdy does not dispute that he engaged in sexual intercourse with J.U. after she turned 16 years old. In fact, at trial, he stipulated that J.U. was pregnant with his child at the time he was arrested. As such, McCurdy's argument on appeal concerns only whether the State sufficiently proved that J.U. did not consent to having sexual intercourse with him after she turned 16 years old, as was alleged in count III of the information. He asserts:

> The evidence is that [J.U.] did not resist sexual activity during the ages of 16 and 17. There is evidence that she even initiated sexual activity. There is no evidence that J.U. was compelled by threat of force to have sex. There is no evidence that she expressed a lack of consent through either word or conduct.

Brief for appellant at 48.

In its brief on appeal, the State asserts that there was sufficient evidence presented at trial to demonstrate that McCurdy

committed first degree sexual assault, as alleged in count III of the information. Specifically, the State asserts that the evidence presented at trial supports a finding that McCurdy knew or should have known that J.U. was incapable of consenting when she was 16 years old because of the prior years of sexual abuse and manipulation she suffered at his hands. In addition, the State asserts that the evidence presented supports a finding that prior to turning 16 years old, J.U. had repeatedly physically and verbally resisted McCurdy's sexual advances without success and that, as a result, by the time she turned 16 years old, any further resistance to McCurdy "would have been useless and futile." Brief for appellee at 26.

Upon our review of the record, we conclude that, at a minimum, there was sufficient evidence presented at trial to demonstrate that in the years McCurdy subjected J.U. to sexual contact prior to her 16th birthday, he had never respected J.U.'s repeated physical or verbal resistance to his sexual advances. As such, by the time J.U. was 16 years old, it was clear to her that any further resistance would have been futile.

At trial, J.U. testified that when McCurdy first began sexually assaulting her, she would tell him "no" and try to push him away. She also testified that her active resistance did not stop him from having sexual intercourse with her. J.U. testified that as the sexual assaults continued, she would still try to push McCurdy away, but that she stopped saying "no," because he would "do it anyway." Eventually, J.U. testified that she stopped resisting the abuse altogether because "he still did it anyway." J.U. also testified that after she turned 16 years old, McCurdy continued to have sexual intercourse with her. She testified that she did not want to have sex with McCurdy and never considered herself to be in a relationship with McCurdy. She also testified that saying "no" would not have made McCurdy stop. She testified that resisting McCurdy's sexual advances had never worked for her.

J.U. also testified that she told McCurdy that she loved him and that she sent him "selfies" of herself in her underwear,

because that is what McCurdy asked her to do. She also admitted during cross-examination that when McCurdy had sent her a text message asking to have sex with her when she came home from work, she had agreed. However, she explained her actions by stating that she was only telling McCurdy "what he wanted to hear." She also again reiterated that McCurdy would not take no for an answer.

Based on J.U.'s testimony as a whole, the jury could have found that J.U. had repeatedly resisted McCurdy's sexual advances verbally and physically without success and that by the time she was 16 years old, any further resistance on her part would have been futile. Therefore, the jury could find the essential elements of the crime of first degree sexual assault beyond a reasonable doubt.

## V. CONCLUSION

Upon our review, McCurdy's convictions and sentences are in all respects affirmed.

Affirmed.