Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/23/2018 12:11 AM CST

State of Nebraska, appellee, v.
Michael W. McCurdy, appellant.
___ N.W.2d ___

Filed October 19, 2018.    No. S-17-061.

1. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
2. \_\_\_\_: \_\_\_\_: \_\_\_\_. When a defendant is charged in alternative ways with committing an offense, the jury can convict if it finds there is sufficient evidence of either alternative, and thus the judgment of conviction must be affirmed if the evidence is sufficient to support either of the State's alternative theories of guilt.
3. **Statutes.** Statutory language is to be given its plain and ordinary meaning.
4. \_\_\_\_. When interpreting a statute, no sentence, clause, or word should be rejected as meaningless or superfluous if it can be avoided.
5. **Sexual Assault: Words and Phrases.** "Coercion" in Neb. Rev. Stat. § 28-318(8)(a)(i) (Reissue 2016) includes nonphysical force.

Petition for further review from the Court of Appeals, Pirtle, Riedmann, and Arterburn, Judges, on appeal thereto from the District Court for Lancaster County, Darla S. Ideus, Judge. Judgment of Court of Appeals affirmed.

Robert W. Kortus, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Miller-Lerman, J.

## NATURE OF CASE

Michael W. McCurdy was convicted of three counts of first degree sexual assault of a child, one count of first degree sexual assault, and one count of intentional child abuse following a jury trial in the district court for Lancaster County. On appeal, the Nebraska Court of Appeals rejected McCurdy's assignments of error and affirmed his convictions and sentences. *State v. McCurdy*, 25 Neb. App. 486, 908 N.W.2d 407 (2018).

We granted McCurdy's petition for further review. On further review, he primarily claims that the Court of Appeals erred when it determined that there was sufficient evidence to support his conviction for first degree sexual assault. Although we employ a different analysis than that employed by the Court of Appeals, we agree with its conclusion that there was sufficient evidence. Further, we find no error in the Court of Appeals' disposition regarding McCurdy's other claims involving rulings and events at trial. We therefore affirm the Court of Appeals' affirmance of McCurdy's convictions and sentences.

## STATEMENT OF FACTS

The five counts charged against McCurdy arose from allegations that over a period of years, he sexually abused his former girlfriend's two eldest daughters, J.U. and K.O. In three charges of first degree sexual assault of a child, the State alleged that McCurdy had (1) subjected J.U. to sexual penetration when she was under 12 years of age, (2) subjected J.U. to sexual penetration when she was at least 12 years of age but less than 16 years of age, and (3) subjected K.O. to

sexual penetration when she was at least 12 years of age but less than 16 years of age. In the charge of first degree sexual assault wherein the charge did not involve a "child" and is the subject of our analysis below, the State alleged that McCurdy had subjected J.U. to penetration without her consent or when he knew or should have known that J.U. was mentally or physically incapable of resisting or appraising the nature of his conduct; this charge of first degree sexual assault related to a time period when J.U. was over 16 years of age. The charge of intentional child abuse involved allegations regarding both J.U. and K.O.

The charges against McCurdy were tried to a jury in October 2016. Both J.U. and K.O. testified at the trial. The Court of Appeals summarized the evidence for which there is support in the record as follows:

J.U. was 18 years old at the time of the trial. She testified that McCurdy has been in her life for as long as she can remember. J.U.'s mother and McCurdy used to be in a long-term romantic relationship, and they share three children together. J.U. testified that McCurdy had been sexually abusing her since she was in middle school. J.U. indicated that since the sexual abuse began, she and her family, including McCurdy, had lived in four different houses. She used these houses to organize her testimony about the years of sexual abuse.

J.U. lived in the "yellow house" from the time she was 5 years old until she was almost 10 years old. While she lived there, she and her younger sister, K.O., shared a bedroom in the attic of the house. One day, when J.U. was approximately 9 years old, she was alone in the bedroom when McCurdy entered the room. J.U. testified, "[H]e came in the room and started taking my pants off and then had intercourse." J.U. testified that after this initial incident, McCurdy would come into her bedroom three to four times per week in order to have sexual intercourse with her. She testified that she would tell McCurdy

"no" and push him away, but that she was unable to stop McCurdy from having sexual intercourse with her. J.U. testified that she did not tell anyone what was happening because she was afraid she would get into trouble and no one would believe her.

J.U. and her family next moved into the "white house." They resided in this house from the time J.U. was 10 years old until she was 13 years old. While J.U. and her family lived in the white house, McCurdy continued to have sexual intercourse with J.U. three to four times per week in her bedroom. She testified that she continued to tell McCurdy "no," but that she did not push him away anymore. She explained that even if she tried to push him away, he would "still do it anyway." J.U. continued to keep the abuse a secret because she was scared.

J.U. and her family moved into the "blue house" when she was 13 years old. They lived at that house until J.U. was almost 15 years old. At the blue house, the abuse continued. J.U. testified that by this time, McCurdy was no longer in a romantic relationship with her mother; however, he continued to reside with the family. J.U. testified that McCurdy continued to have sexual intercourse with her three to four times per week, both in her bedroom and occasionally in her mother's bedroom. In addition, while they were living in the blue house, McCurdy began to rub J.U.'s vagina with his hands and put his mouth on her vagina. J.U. described that McCurdy would put lotion all over her body, including on her breasts, her buttocks, and her vagina. J.U. indicated that she had stopped saying "no" to McCurdy, "[b]ecause he still did it anyway." She continued to keep the abuse a secret.

When J.U. was almost 15 years old, she, her mother, and her siblings moved into "the Sandstone house." McCurdy did not reside at this residence; however, he stayed overnight at the home on a regular basis,

oftentimes without J.U.'s mother's knowledge. At the Sandstone house, J.U. slept in the basement on a futon. When McCurdy would sleep at the Sandstone house, he would typically sleep with J.U. on the futon. McCurdy had sexual intercourse with J.U. three to four times per week in her basement bedroom. In addition, McCurdy put his hands and mouth on her vagina. J.U. no longer resisted McCurdy's actions.

In 2014, just prior to J.U.'s turning 16 years old, she became pregnant. J.U. testified that McCurdy was the father of the baby. In fact, she testified that she had never had sexual intercourse with anyone other than McCurdy. When McCurdy discovered that J.U. was pregnant, he told her to tell her mother that someone else was the father. J.U. testified that she followed McCurdy's directions and "ma[d]e up a name" to tell her mother. J.U.'s pregnancy did not result in a live birth.

During the summer of 2015, when J.U. was 17 years old, she became pregnant for a second time. The parties stipulated at trial that McCurdy was the father of J.U.'s baby. J.U. testified that when McCurdy found out she was pregnant, he instructed her "[t]o make up a name again" to tell her mother. However, on August 7, 2015, J.U. told her mother that she was pregnant with McCurdy's baby. J.U.'s mother then called police.

K.O. was 16 years old at the time of the trial. She testified that she has known McCurdy for her entire life. She also testified that McCurdy had been sexually assaulting her since she was approximately 10 years old. Like J.U., K.O. organized her testimony about the years of sexual abuse using the houses where she and her family had lived in the last few years.

When K.O. lived in the blue house, she was between the ages of 11 years old and 13 years old. She testified that while she lived in this house, McCurdy gave her a video game system as a present. He took her out of school

so that they could play the game together all day and into the night. McCurdy then told K.O. to sleep in his bed so the younger children did not wake her up. McCurdy laid down with K.O. in the bed. K.O. testified that while they laid together, he attempted to "put[ ] his penis in [her] shorts." She pulled away from him and nothing further happened on this occasion. Subsequently, however, McCurdy asked K.O. to rub his penis and "scratch[ ]" his "balls." He would sometimes tell her to use lotion when she was touching his penis. Eventually, McCurdy put his penis in K.O.'s vagina. He then continued to have sexual intercourse with her twice per week. McCurdy also put his fingers in K.O.'s vagina.

K.O. testified that she tried to resist McCurdy by pushing him away or trying to get away from him. She also told him "no." She indicated that sometimes she was able to successfully resist his actions. However, other times, McCurdy would "punish" her for her resistance. Such punishment included using his fingers to "[g]o higher up . . . in [her] vagina" to cause her pain. Additionally, K.O. testified that McCurdy would be "violent" with her sometimes. He would slap her, punch her, choke her, and hold her arms down.

K.O. testified that she did not tell her mother what was happening because she did not think her mother would believe her. She also testified that before McCurdy began abusing her, she observed J.U. and McCurdy having sexual intercourse in her mother's bedroom.

When K.O. and her family moved to the Sandstone house, K.O. was 13 years old. K.O. testified that at the Sandstone house, the sexual intercourse and sexual contact continued. K.O. indicated that the sexual contact included McCurdy rubbing lotion all over her body. At the Sandstone house, McCurdy had sexual intercourse with K.O. approximately twice every other week. K.O. believed that the abuse happened less often at the

Sandstone house because she continued to resist McCurdy and actively tried to stay away from him.

K.O. described three specific instances of sexual contact at the Sandstone house that she remembered. First, she described one occasion where McCurdy attempted to have her put her mouth on his penis, but she successfully resisted him. Then, she described an occasion where McCurdy put his fingers in her vagina while they were in the living room watching a movie with her younger siblings. K.O. indicated that she and McCurdy were under a blanket. Finally, she described an incident where she resisted McCurdy and he got mad and put his hands around her neck.

K.O. testified that she did not tell her mother about what was happening because she did not think her mother would believe her. K.O. admitted that she had lied to her mother about other things. K.O. did not tell her mother about the abuse until after J.U. had reported her experiences to police.

The State offered evidence in addition to J.U.'s and K.O.'s testimony. Such additional evidence included DNA evidence from the Sandstone house, the testimony of an expert witness concerning behaviors of child sexual assault victims, and a recording of an interview between law enforcement and McCurdy which was conducted just prior to McCurdy's arrest. . . . The State also offered into evidence numerous photographs of J.U. and K.O. which were located on McCurdy's cellular telephone and on the family's computer under a user account titled "Mike." Some of these photographs had comments of a sexual nature electronically superimposed on them.

McCurdy did not testify at trial, nor did he offer any evidence in his defense. However, throughout the cross-examination of the State's witnesses and during closing arguments, McCurdy's counsel indicated that McCurdy did not dispute that he and J.U. engaged in sexual

intercourse after she turned 16 years old. McCurdy contended that his sexual relationship with J.U. at that time was consensual. McCurdy did dispute that he had ever had sexual intercourse with K.O. He also disputed that he had sexual intercourse with J.U. prior to her turning 16 years old. Much of McCurdy's defense involved attacking the credibility of J.U. and K.O. during their cross-examinations. McCurdy pointed out numerous inconsistencies between J.U.'s and K.O.'s trial testimony and their prior statements about the sexual abuse.

*State v. McCurdy*, 25 Neb. App. 486, 489-93, 908 N.W.2d 407, 412-14 (2018). The jury found McCurdy guilty of all five counts, and the district court thereafter sentenced McCurdy to imprisonment for a total of 95 to 115 years for the five convictions.

McCurdy appealed to the Court of Appeals and made five assignments of error. The Court of Appeals rejected all of McCurdy's assignments of error and affirmed his convictions and sentences. We granted McCurdy's petition for further review.

## ASSIGNMENTS OF ERROR

McCurdy claims on further review that the Court of Appeals erred when it determined that there was sufficient evidence to support his conviction for first degree sexual assault of J.U. without addressing whether there was sufficient evidence that J.U. lacked the mental capacity to consent.

McCurdy also claims that the Court of Appeals erred when it rejected his assignments of error (1) challenging the admission of expert testimony concerning the behaviors and testimonial patterns of child sexual assault victims, (2) claiming prosecutorial misconduct, and (3) admitting DNA evidence. We find no error in the Court of Appeals' disposition of these three issues, and we see no need for further comment on them. Therefore, our analysis below is limited to the sufficiency of the evidence to support McCurdy's conviction for first degree sexual assault of J.U.

## STANDARD OF REVIEW

[1] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Wells*, 300 Neb. 296, 912 N.W.2d 896 (2018).

## ANALYSIS

McCurdy claims on further review that the Court of Appeals erred when it determined that there was sufficient evidence to support his conviction for first degree sexual assault without addressing whether there was sufficient evidence that the victim, J.U., lacked the mental capacity to consent. McCurdy's argument presumes that the Court of Appeals affirmed his conviction for first degree sexual assault on the basis of a finding that he subjected J.U. to sexual penetration when he knew or should have known that she was mentally incapable of consent. Contrary to McCurdy's contention, we read the Court of Appeals' opinion as concluding that there was sufficient evidence to support McCurdy's conviction for first degree sexual assault on the basis of a finding that he subjected J.U. to sexual penetration without her consent. And, although we employ an analysis that differs in certain respects from that used by the Court of Appeals, we agree with its conclusion that there was sufficient evidence to find that McCurdy subjected J.U. to sexual penetration without her consent.

McCurdy claims on appeal that there was insufficient evidence to support his conviction for first degree sexual assault; he does not challenge the sufficiency of the evidence related to his other convictions. The first degree sexual assault statute,

Neb. Rev. Stat. § 28-319(1)(a), (b), and (c) (Reissue 2016), sets forth three ways in which one could be found guilty of the offense. Section 28-319(1) provides that one is guilty of first degree sexual assault if one

subjects another person to sexual penetration (a) without the consent of the victim, [or] (b) who knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct, or (c) when the actor is nineteen years of age or older and the victim is at least twelve but less than sixteen years of age . . . .

To prove guilt under § 28-319, it must be shown that the offender subjected the victim to sexual penetration along with one of the three alternatives set forth in § 28-319(1)(a), (b), and (c).

The State alleged that McCurdy committed first degree sexual assault against J.U. when she was 16 years of age or older. Therefore, § 28-319(1)(c), pertaining to victims "at least twelve but less than sixteen years of age," did not apply to the charge of first degree sexual assault in this case. Instead, the State alleged in the information that McCurdy subjected J.U. to sexual penetration either without the consent of J.U., in violation of § 28-319(1)(a), or, alternatively, when McCurdy knew or should have known that J.U. was mentally or physically incapable of resisting or appraising the nature of his conduct, in violation of § 28-319(1)(b). The district court in this case instructed the jury on both alternatives, using the language of § 28-319(1)(a) and (b), as well as the statutory definitions of certain terms, including the term "without consent."

The Court of Appeals concluded that there was sufficient evidence to support the charge of first degree sexual assault. The Court of Appeals' analysis focused on evidence showing that because McCurdy had sexually abused her in the past, J.U. found it futile or useless to resist McCurdy's sexual advances after she turned 16. The Court of Appeals concluded as follows:

Based on J.U.'s testimony as a whole, the jury could have found that J.U. had repeatedly resisted McCurdy's sexual advances verbally and physically without success and that by the time she was 16 years old, any further resistance on her part would have been futile. Therefore, the jury could find the essential elements of the crime of first degree sexual assault beyond a reasonable doubt.

*State v. McCurdy*, 25 Neb. App. 486, 514, 908 N.W.2d 407, 425-26 (2018).

McCurdy claims on further review that the Court of Appeals erred because it did not address the argument that there was not sufficient evidence to support a finding that J.U. was rendered incapable of consent. In this regard, we note that the State had argued, at least in part, to the Court of Appeals that the evidence in this case supported a finding that McCurdy's sexual abuse of J.U. prior to her turning 16 years old rendered her incapable of resisting or appraising the nature of McCurdy's conduct after she turned 16 years old. We think that McCurdy's argument on further review misreads the basis on which the Court of Appeals concluded that there was sufficient evidence to support his conviction for first degree sexual assault: to wit, the sexual penetration was without J.U.'s consent.

McCurdy's argument focuses exclusively on § 28-319(1)(b) and whether there was sufficient evidence regarding J.U.'s mental capability in relation to consent. But we read the Court of Appeals' opinion as concluding that because there was sufficient evidence to find that sexual penetration occurred without the consent of J.U., there was sufficient evidence to support a conviction for first degree sexual assault under § 28-319(1)(a). Having concluded that the evidence was sufficient under § 28-319(1)(a), the Court of Appeals did not need to address whether there was also sufficient evidence to find that J.U. lacked the mental capacity to consent under § 28-319(1)(b).

[2] We have stated that when a defendant was charged in alternative ways with committing an offense, "the jury could

convict if it found there was sufficient evidence of either [alternative], and thus the judgment of conviction must be affirmed if the evidence is sufficient to support either of the State's alternative theories of guilt." *State v. Eagle Bull*, 285 Neb 369, 375, 827 N.W.2d 466, 471 (2013). See, also, *State v. Knutson*, 288 Neb. 823, 843, 852 N.W.2d 307, 324 (2014) ("judgment must be affirmed if [evidence] was sufficient to support any of the State's three theories of guilt"). In these cases, after we found sufficient evidence to support a conviction under one theory, we stated that we need not consider whether the evidence was sufficient to support the alternative theory or theories of guilt. In *Eagle Bull*, we noted that the defendant had not objected to the court's instructing on alternative theories on the basis that there was not sufficient evidence to support each alternative and that the defendant did not raise the instruction issue on appeal. In the present case, McCurdy did not object to the instruction and he did not assign error on appeal to the giving of the instruction.

The Court of Appeals' analysis focused on evidence that, because of McCurdy's prior sexual assault of J.U., it would have been useless or futile for J.U. to resist McCurdy's sexual advances after she turned 16 years old. As we discuss further below, this analysis was relevant to whether there was sufficient evidence that the sexual penetration was without J.U.'s consent. However, the Court of Appeals' analysis focused exclusively on one aspect of the statutory definition of "without consent" and did not focus on other relevant portions of the definition. In our discussion below, we supply the missing analysis.

Within Nebraska's sexual assault statutes, Neb. Rev. Stat. § 28-318 (Reissue 2016) provides definitions for terms used in § 28-319 and related statutes. Subsection 28-318(8) defines "without consent" as follows:

Without consent means:

(a)(i) The victim was compelled to submit due to the use of force or threat of force or coercion, or (ii) the

victim expressed a lack of consent through words, or (iii) the victim expressed a lack of consent through conduct, or (iv) the consent, if any was actually given, was the result of the actor's deception as to the identity of the actor or the nature or purpose of the act on the part of the actor;

(b) The victim need only resist, either verbally or physically, so as to make the victim's refusal to consent genuine and real and so as to reasonably make known to the actor the victim's refusal to consent; and

(c) A victim need not resist verbally or physically where it would be useless or futile to do so[.]

The Court of Appeals' analysis in this case focused on § 28-318(8)(c) and whether there was evidence that it would have been useless or futile for J.U. to resist McCurdy. The Court of Appeals did not appear to comment on whether there was evidence that sexual penetration was "without consent" within one of the definitions set forth in § 28-318(8)(a).

As we read § 28-318(8), in order to determine whether sexual activity was "without consent" of the alleged victim, one of the four alternatives set forth in subsection (a) must be shown. That is, it must be shown that either (1) the defendant compelled the victim to submit due to the use of force or threat of force or coercion, (2) the victim expressed a lack of consent through words, (3) the victim expressed a lack of consent through conduct, or (4) the defendant used deception to obtain consent. We do not read § 28-318(8)(b) and (c) as setting forth additional independent alternative means to show that sexual penetration was "without consent." Instead, we read these subsections as informing the nature of the proof necessary to show one of the definitions set forth in subsection (a). That is, subsection (b) describes the nature of resistance which must be shown in circumstances where resistance by the victim is relevant to proving that sexual activity was "without consent." Subsection (c) describes circumstances in which it is not necessary to show resistance by the victim in order to prove that sexual activity was "without consent."

Therefore, the Court of Appeals' analysis of evidence showing that it would have been useless or futile for J.U. to resist verbally or physically was relevant to show that it was not necessary to prove that J.U. resisted in order to prove that sexual penetration was without her consent. The evidence of uselessness or futility was necessary but not sufficient to show that sexual penetration was without J.U.'s consent. Instead, to prove consent was lacking, it was also necessary to show that sexual penetration occurred in a manner described in one of the four alternatives set forth in § 28-318(8)(a). We perform that analysis below.

We first note that we do not find that there was evidence in this case that at the time relevant to the charge of first degree sexual assault, J.U. expressed a lack of consent through words or conduct. There was evidence that J.U. expressed her lack of consent when McCurdy first began sexually assaulting her, but J.U. testified that in the relevant time period, after she turned 16, she had stopped resisting and expressing her lack of consent, because it had not worked in the past. Therefore, there was no evidence that sexual penetration was "without consent" within the meanings set forth in § 28-318(8)(a)(ii) and (iii). We also find no evidence that McCurdy gained J.U.'s consent through deception, and therefore there was no evidence that sexual penetration was "without consent" within the meaning set forth in § 28-318(8)(a)(iv).

Having eliminated § 28-318(8)(a)(ii), (iii), and (iv), we consider whether the evidence supports a finding under § 28-318(8)(a)(i) that J.U. "was compelled to submit due to the use of force or threat of force or coercion." By its terms, § 28-318(8)(a)(i) sets forth three ways one might compel another person to submit: (1) use of force, (2) threat of force, or (3) coercion. "Use of force" and "threat of force" are defined in the statute, but "coercion" is not. With regard to "use of force" and "threat of force," § 28-318(9) supplies the following definitions:

Force or threat of force means (a) the use of physical force which overcomes the victim's resistance or (b) the threat of physical force, express or implied, against the victim or a third person that places the victim in fear of death or in fear of serious personal injury to the victim or a third person where the victim reasonably believes that the actor has the present or future ability to execute the threat.

As noted above, there was no evidence in this case that J.U. actively resisted McCurdy at the times relevant to the charge of first degree sexual assault, when J.U. was over 16. Therefore, there was no evidence that McCurdy used physical force which overcame J.U.'s resistance and no evidence that McCurdy compelled J.U. to submit by "use of force" as that term is defined in § 28-318(9). We also do not think that the evidence shows that McCurdy compelled J.U. to submit by "threat of force," because the definition of that term in § 28-318(9) specifies "physical force" and further limits the threat to one that "places the victim in fear of death or in fear of serious personal injury." We believe the evidence in this case did not show that McCurdy threatened J.U. in a manner that put her in fear of death or serious personal injury.

Based on the foregoing, the issue before us is whether the evidence supported a finding that McCurdy compelled J.U. to submit to sexual penetration by "coercion." As noted, "coercion" as used in § 28-318(8)(a)(i) is not statutorily defined in § 28-318 or elsewhere, so we must look to the statute as a whole, as well as other sources, to understand "coercion" as it is used in § 28-318(8)(a)(i).

[3] Statutory language is to be given its plain and ordinary meaning. *State v. Clemens*, 300 Neb. 601, 915 N.W.2d 550 (2018). Black's Law Dictionary defines "coercion" as "[c]ompulsion of a free agent by physical, moral, or economic force or threat of physical force." Black's Law Dictionary 315 (10th ed. 2014). Under this definition, although "coercion"

includes physical force and the threat of physical force, it also includes other, nonphysical forms of force.

[4,5] We have said that when interpreting a statute, no sentence, clause, or word should be rejected as meaningless or superfluous if it can be avoided. See *State v. Clemens, supra*. Section 28-318(8)(a)(i) includes "force," "threat of force," and "coercion" as separate manners of compelling submission. Because "force" and "threat of force" are both defined in § 28-318(9) in terms of physical force, we determine that "coercion" would be redundant and even superfluous in the context of § 28-318(8)(a)(i) if it were limited to physical force. Accordingly, we hold that "coercion" in § 28-318(8)(a)(i) includes nonphysical force.

Having determined that "coercion" under § 28-318(8)(a)(i) includes nonphysical forms of force, we consider whether the evidence in this case supports a finding that McCurdy compelled J.U. to submit to sexual penetration due to the use of "coercion." We conclude that the evidence in this case regarding the history of McCurdy's sexual abuse of J.U. in the years prior to the time related to the charge of first degree sexual assault, as well as evidence regarding McCurdy's position of authority and dominion within J.U.'s life and household, was sufficient for the jury to find that at the times relevant to the charge of first degree sexual assault, McCurdy compelled J.U. to submit to sexual penetration by use of coercion, and therefore, the sexual acts were without consent.

In reaching this conclusion, we have looked to cases from other jurisdictions in which courts have found that circumstances similar to those in the present case supported a conviction for sexual assault. We note in this regard that statutes criminalizing rape or sexual assault in other states are not generally uniform and that the wording of such statutes varies among states. The cases discussed below generally involve statutes that do not use the word "coercion." However, whether or not the relevant statutes in these cases use the same wording and definitions as Nebraska's sexual assault statutes,

we find the cases informative as to whether the circumstances of this case support a finding of "coercion" under Nebraska's sexual assault statutes. The statutes commonly use the word "force," and the opinions often attempt to find whether the circumstances establish "force." As indicated below, the cases do not limit "force" to physicality. We think that if the circumstances establish that "force" under another state's statutes includes nonphysical means, it tends to support a conclusion that similar circumstances can establish "coercion" under our statutes, because "coercion" includes nonphysical forms of force.

As we have indicated, courts have recognized that a psychological rather than physical force can support a conviction for sexual assault. See *State v. Watkins*, 92 A.3d 172, 186 (R.I. 2014) ("psychological coercion is sufficient to prove the force or coercion element of sexual assault, even in the absence of physical force"). Such psychological force or coercion has particularly been found in circumstances where abuse is carried out by adult authority figures in family or household settings.

For example, in *State v. Meyers*, 799 N.W.2d 132 (Iowa 2011), the defendant was charged with, inter alia, sexual abuse in the third degree; the alleged victim was the defendant's stepdaughter who was 17 years old at the time of the alleged abuse. The State in *Meyers* offered two alternative theories of sexual abuse under the relevant Iowa statute—that the defendant performed sex acts by force or "'against the will'" of the victim or, alternatively, that he performed sex acts at a time when the victim was suffering from a mental defect or incapacity. 799 N.W.2d at 140.

In interpreting the "against the will" language of the statute, the Iowa Supreme Court stated, "Clearly, the 'against the will of another' standard seeks to broadly protect persons from nonconsensual sex acts, even under circumstances showing the victim had no opportunity or ability to consent due to the inherently *coercive* nature of the circumstances." *Meyers*,

799 N.W.2d at 143 (emphasis supplied). The Iowa Supreme Court noted that under the statute, "physical resistance is not required 'to establish that an act of abuse is committed by force or against the will of a person'" and that instead, "'the circumstances surrounding the commission of the act' [must] be considered in determining whether the act was 'by force or against the will of the other.'" *Id*. at 142-43. In concluding that the evidence in *Meyers* supported a finding that the sex acts engaged in between the defendant and the victim were "'by force or against the will'" of the victim, the Iowa Supreme Court noted evidence of the totality of the circumstances, including, inter alia, "the disparity in age between [the defendant] and [the victim], the background and history of their relationship," and "the authority exercised by [the defendant]." 799 N.W.2d at 147.

The Iowa Supreme Court in *Meyers* also specifically concluded that "psychological force or inability to consent based on the relationship and circumstance of the participants may give rise to a conviction under the 'against the will' element" of sexual abuse. 799 N.W.2d at 146. The court looked to other jurisdictions in considering whether "psychological force" can establish sexual abuse. The court cited *Com. v. Rhodes*, 510 Pa. 537, 555, 510 A.2d 1217, 1226 (1986), in which the Pennsylvania Supreme Court determined that the Pennsylvania rape statute's reference to "'forcible compulsion'" included not only physical force or violence, "but also moral, psychological or intellectual force used to compel a person to engage in sexual intercourse against that person's will." To determine if force had been used, the Pennsylvania Supreme Court focused on a totality of the circumstances analysis and cited various factors, including:

> the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position

of authority, domination or custodial control over the victim, and whether the victim was under duress.

*Id.*

In *U.S. v. Davis*, 875 F.3d 592, 596 (11th Cir. 2017), the Court of Appeals for the 11th Circuit considered whether a conviction under an Alabama statute criminalizing sexual abuse by forcible compulsion was a "violent felony" for purposes of sentence enhancement. After reviewing Alabama case law, the 11th Circuit determined that the Alabama statute did not necessarily require the use, attempted use, or threatened use of physical force. The 11th Circuit relied on, inter alia, *Powe v. State*, 597 So. 2d 721, 728 (Ala. 1991), in which the Alabama Supreme Court concluded that "a jury could reasonably infer that [the defendant] held a position of authority and domination with regard to his daughter sufficient to allow the inference of an implied threat to her if she refused to comply with his demands." The Alabama court limited its holding in *Powe* "to cases concerning the sexual assault of children by adults with whom the children are in a relationship of trust" and reasoned that such cases are distinct because of "the great influence and control that an adult who plays a dominant role in a child's life may exert over the child" and that "[w]hen a defendant who plays an authoritative role in a child's world instructs the child to submit to certain acts, an implied threat of some sort of disciplinary action accompanies the instruction." 597 So. 2d at 728-29.

In *State v. Etheridge*, 319 N.C. 34, 352 S.E.2d 673 (1987), the North Carolina Supreme Court emphasized the intrafamilial context when it determined that there was sufficient evidence to establish the statutory requirement of "force." The court determined that "constructive force could be reasonably inferred from the circumstances surrounding the parent-child relationship," and it noted that the victim "was conditioned to succumb to defendant's illicit advances at an age when he could not yet fully comprehend the implications of defendant's conduct." *Id*. at 47, 352 S.E.2d at 681. The court further noted

that the "incidents of abuse all occurred while the boy lived as an unemancipated minor in defendant's household, subject to defendant's parental authority and threats of disciplinary action." *Id*. at 47-48, 352 S.E.2d at 681. The court concluded in *Etheridge* that in cases of this sort,

> the parent wields authority as another assailant might wield a weapon. The authority itself intimidates; the implicit threat to exercise it coerces. Coercion, as state above, is a form of constructive force. For this reason, we hold that the state presented sufficient evidence from which the jury could reasonably infer that defendant used his position of power to force his son's participation in sexual acts.

319 N.C. at 48, 352 N.E.2d at 682.

The Ohio Supreme Court in *State v. Eskridge*, 38 Ohio St. 3d 56, 58-59, 526 N.E.2d 304, 306 (1988), "recognize[d] the coercion inherent in parental authority when a father sexually abuses his child" and concluded that under such circumstances, "[f]orce need not be overt and physically brutal, but can be subtle and psychological." We note that the Ohio Supreme Court in *State v. Schaim*, 65 Ohio St. 3d 51, 55, 600 N.E.2d 661, 665 (1992), a case involving a victim who was 20 years old, distinguished *Eskridge*, which involved a young victim. The court concluded that while a "threat of force can be inferred from the circumstances surrounding sexual conduct, . . . a pattern of incest will not substitute for the element of force where the state introduces no evidence that an adult victim believed that the defendant might use physical force against her." However, *Schaim* was applying a statute that required a showing that the defendant "'compel[led] the other person to submit by force or threat of force'" and that defined "force" and "threat of force" in terms of physical force. 65 Ohio St. 3d at 54, 600 N.E.2d at 665.

In the cases discussed above, the courts were generally dealing with statutes that required a showing of force and the courts found that "force" could be shown by nonphysical

coercion under the relevant circumstances. By comparison, Nebraska's statute includes "coercion," as well as "force," and as discussed above, we read "coercion" as a distinct means of compelling a person to submit that does not necessarily require a showing of physical force. We therefore think that under a totality of the circumstances analysis, coercion within the context of a family or household relationship between a minor and an adult authority figure can support a finding that a defendant compelled a victim to submit to sexual penetration by the use of "coercion."

The charge of first degree sexual assault in this case involved McCurdy's subjecting J.U. to sexual penetration when she was over 16 years of age. McCurdy did not dispute that he had sexual intercourse with J.U. when she was 16 and 17 years old, and he admitted that at the time he was arrested, J.U. was pregnant with his child. There was evidence that McCurdy had sexually assaulted J.U. over a period of years prior to her turning 16. J.U. testified that when McCurdy first began sexually assaulting her, she would tell him "'no'" and try to push him away but that she eventually stopped resisting, because "'he still did it anyway.'" See *State v. McCurdy*, 25 Neb. App. 486, 490, 908 N.W.2d 407, 412 (2018). She also testified that after she turned 16 years old, she did not want to have sex with McCurdy but she knew that resisting his advances had never worked for her. We think that evidence of a history of sexually assaulting J.U. combined with the authority McCurdy exerted as an adult in J.U.'s household were sufficient to establish "coercion" under § 28-318(8)(a)(i).

Given the foregoing, we determine that there was sufficient evidence from which the jury could have found that McCurdy subjected J.U. to sexual penetration "without consent"; specifically, he compelled J.U. to submit to sexual penetration by use of coercion. We therefore conclude that the Court of Appeals did not err when it determined that there was sufficient evidence to support McCurdy's conviction for first degree sexual assault.

## CONCLUSION

We find no error in the Court of Appeals' disposition of McCurdy's assignments of error relating to (1) the admission of expert testimony concerning the behaviors and testimonial patterns of child sexual assault victims, (2) a claim of prosecutorial misconduct, and (3) the admission of DNA evidence. With regard to the sufficiency of the evidence to support McCurdy's conviction for first degree sexual assault of J.U., although our analysis differs from that of the Court of Appeals, we agree with the Court of Appeals' conclusion that there was sufficient evidence to support the conviction. We therefore affirm the Court of Appeals' affirmance of McCurdy's convictions and sentences.

Affirmed.

Freudenberg, J., not participating.