IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

K.J. v. Stewart

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

K.J., APPELLEE,

V.

HENSLEY STEWART, APPELLANT.

Filed March 15, 2022.    No. A-21-548.

Appeal from the District Court for Douglas County: THOMAS K. HARMON, Judge. Affirmed.

Andrew J. Hilger, of Law Office of Andrew J. Hilger, for appellant.

No appearance for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

INTRODUCTION

K.J. was granted a sexual assault protection order against Hensley Stewart by the Douglas County District Court. Stewart appeals the court's order, claiming (1) the court lacked subject matter jurisdiction because the matter was heard by a county court judge when a district court judge was requested, and (2) the evidence was insufficient to support the entry of the protection order. We affirm.

BACKGROUND

On May 18, 2021, K.J. filed a "Petition and Affidavit to Obtain Sexual Assault Protection Order" in the district court. She alleged that on May 11, she and Stewart were "leaving dinner to go to his residence to talk about a dog-walking service that [she] recently started." She wanted to "meet his dog before [she] agreed to start walking her." They entered Stewart's vehicle and he

- 1 -

began to drive. K.J. alleged that "[m]oments later . . . he reached over and placed his bare hand under [her] dress" and "was groping [her] breasts and pinching [her] nipples." This contact made K.J. "extremely uncomfortable and intimidated." She claimed that Stewart then said, "Remember how I said I was Jamaican?" and thereafter "remove[d] his penis from his pants, gestured towards it and told [her] to grab it." She "was frozen in fear" and "complied," "[f]earing [that] he would retaliate physically if [she] didn't." Upon arriving at his residence, Stewart gave K.J. a "tour" and "while showing [her] around [they] entered the bedroom." Stewart told K.J. she should "try out the bed." She "initially refused," but "on his insistance [sic]," she complied. K.J. claimed that Stewart "proceeded to climb on top of [her]" and she "sternly said no." Stewart "got off of" her and they walked downstairs. Stewart told her that she "'probably shouldn't get into cars with strangers.'" This caused K.J. to "fear for [her] safety[,]" and she "thought he was going to rape" her. K.J. asked Stewart to take her back to her vehicle, and "he complied." K.J. checked a box on her petition requesting that a district court judge preside over this matter pursuant to Neb. Rev. Stat. § 25-2740 (Cum. Supp. 2020).

An ex parte sexual assault protection order was entered later that same day, May 18, 2021, precluding Stewart from coming into contact with K.J. On May 20, Stewart filed a request for a hearing on the ex parte protection order.

At a hearing held on June 17, 2021, K.J. appeared pro se and Stewart appeared with counsel. K.J. was sworn in and her "Petition and Affidavit to Obtain Sexual Assault Protection Order" was marked and received into evidence without objection. K.J. then testified consistent with the allegations set forth in her petition.

On cross-examination, K.J. testified that she was at a bar and Stewart was also there. K.J. responded affirmatively when asked if she had ever met Stewart before that. K.J. had been at the bar "for about an hour after walking another person's dog." She had "two or three" drinks, and then "announced" she was going to dinner alone. Stewart, who was at another table, "asked if he could join [her]." Between 7 p.m. and 8 p.m., they drove separate cars to a restaurant a few minutes away. They dined for "about an hour," and K.J. had a "double" bourbon during dinner. It was "dark out" when they left, "so it must have been after nine." She recalled that the drive to Stewart's residence took approximately 5 minutes. When asked if she ever said "no" when Stewart was placing his hands under her dress or gesturing for her to grab his penis, K.J. responded, "No." When K.J. was asked if she ever asked Stewart to take her back to her car after they left the restaurant and until they arrived at Stewart's house, she responded, "No. I was afraid." When asked if Stewart had threatened her, K.J. responded, "No." When asked if Stewart ever displayed any "physical force" towards her, K.J. responded, "Only when he climbed on top of me, but it wasn't force; I just told him no, and he got off." When K.J. laid on Stewart's bed "willingly" after he "insist[ed] the second time," and Stewart "climbed on top" of her and she "said no," K.J. acknowledged that Stewart "got off of [her]" and "[a]fter a bottle of water," took her back to her car. She confirmed that she waited a week before filing her petition for a sexual assault protection order, and she had no further contact or communication with Stewart after he drove her back to the restaurant.

Stewart also testified regarding the events that occurred. He stated that May 11, 2021, was the first and only time that he remembered meeting K.J. He was at the bar with a couple other people when K.J. arrived. His recollection was that he had asked aloud if anyone wanted to "go

eat," and K.J. answered in the affirmative. They agreed on a restaurant and drove separately. K.J. referenced her dog-walking service during their meal, and Stewart suggested K.J. might look after his dog. K.J. asked to "meet the dog, see if the dog gets along with her, and know the layout of the house." Regarding the drive to his house, Stewart denied ever touching K.J.'s breasts or having any other sexual contact, testifying that there was only "[i]ncidental touching" between the two, such as unintentionally "brushing her hand" with his. Stewart also denied remarking that he was Jamaican, stating that this was not something he would say because he is not Jamaican. He gets "very upset" when people "try to taunt [him] with that," as he makes it "very clear that [he is] Grenadan." He denied removing his penis from his pants during the car ride to his house.

When they arrived at his home, Stewart gave K.J. a tour. He did not remember K.J. sitting on his bed, but he testified they "were both inebriated, to say the least" and that he did not know if she sat on his bed or not. When asked if he had ever been on top of K.J. physically while she was on his bed, Stewart responded, "Absolutely not." Stewart drove K.J. back to the restaurant between 8:20 and 8:30 p.m. According to Stewart, he received a text message from K.J. after dropping her off at the restaurant. He offered a screenshot of that text message as exhibit 2. Exhibit 2 indicates that Stewart received a message at 8:25 p.m. from a person labeled as "Kyler" in his cell phone, and the message read, "Hey it's [k***], lerme [sic] know about dog watching!" We note that K.J. testified regarding her cell phone number, and the phone number she confirmed as hers matched the phone number listed on exhibit 2.

After taking the matter under advisement, the trial court entered an order on June 25, 2021. The court determined that it had jurisdiction pursuant to § 25-2740 and Neb. Rev. Stat. § 28-311.11 (Cum. Supp. 2020). Concerning the parties' respective testimonies, the court found K.J.'s testimony to be credible despite "a few inconsistencies," but such "discrepancies [did] not undermine her credibility" regarding her account of the events on May 11. In contrast, the court found Stewart to be "not credible" and "simply . . . untruthful." After setting forth the evidence presented, the court concluded that K.J. had satisfied her burden of proof and accordingly ordered the provisions of the ex parte sexual assault protection order entered on May 18, 2021, to remain in effect for a period of 1 year.

Stewart appeals.

ASSIGNMENTS OF ERROR

Stewart claims (1) the "county court lacked subject matter jurisdiction because [K.J.] did not request the county court to preside," and (2) there was insufficient evidence to affirm the ex parte sexual assault protection order.

STANDARD OF REVIEW

Subject matter jurisdiction is a question of law for the court, which requires an appellate court to reach a conclusion independent of the lower court's decision. *Mahmood v. Mahmud*, 279 Neb. 390, 778 N.W.2d 426 (2010).

A protection order is analogous to an injunction. Accordingly, the grant or denial of a protection order is reviewed de novo on the record. *Id.* In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court. *Torres v. Morales*, 287 Neb. 587, 843 N.W.2d 805 (2014). However, where the credible evidence is in conflict on a

material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

ANALYSIS

SUBJECT MATTER JURISDICTION

Stewart alleges that there was a lack of subject matter jurisdiction in this matter due to a county court judge presiding over the proceeding despite K.J. checking the box on the form petition requesting a district court judge. We note that the petition itself informs the applicant for the protection order that the request for either a county court judge or a district court judge to preside over the proceeding "may not be granted." Nevertheless, Stewart alleges that § 25-2740 "states that the county court is appointed to preside only if the petitioner requests it." Brief for appellant at 9. And since K.J. did not request a county court judge, Stewart contends the county court lacked jurisdiction. We disagree.

Subject matter jurisdiction is the power of a tribunal to hear and determine a case in the general class or category to which the proceedings in question belong and to deal with the general subject matter involved. *Boyd v. Cook*, 298 Neb. 819, 906 N.W.2d 31 (2018). Parties cannot confer subject matter jurisdiction upon a judicial tribunal by either acquiescence or consent, nor may subject matter jurisdiction be created by waiver, estoppel, consent, or conduct of the parties. *Id*. A lack of subject matter jurisdiction may be raised at any time by any party or by the court sua sponte. *Id*. A ruling made in the absence of subject matter jurisdiction is a nullity. *Spady v. Spady*, 284 Neb. 885, 824 N.W.2d 366 (2012). However, just as parties may not confer subject matter jurisdiction on a court by consent, neither may parties deprive a court of subject matter jurisdiction by their own agreement. *Boyd v. Cook, supra*. A court's subject matter jurisdiction derives from the constitutional and statutory sources of its authority, not the agreement of the litigants that appear before it. *Id*.

Section 28-311.11(1) states that "[a]ny victim of a sexual assault offense may file a petition and affidavit for a sexual assault protection order." Such petition "shall be filed with the clerk of the district court and the proceeding may be heard by the county court or the district court as provided in section 25-2740." § 28-311.11(3). As relevant to this case, § 25-2740 provides in pertinent part:

(1) For purposes of this section:

(a) Domestic relations matters means proceedings under . . . section[] 28-311.11 [regarding sexual assault protection orders] . . . .

. . . .

(2) Except as provided in subsection (3) of this section, in domestic relations matters, a party shall file his or her petition or complaint and all other court filings with the clerk of the district court. *The party shall state in the petition or complaint whether such party requests that the proceeding be heard by a county court judge or by a district court judge. If the party requests the case be heard by a county court judge, the county court judge assigned to hear cases in the county in which the matter is filed at the time of the hearing is deemed appointed by the district court and the consent of the county court judge is not required. Such proceeding is considered a district court proceeding, even if heard*

- 4 -

*by a county court judge, and an order or judgment of the county court in a domestic*
*relations matter has the force and effect of a district court judgment.*

(Emphasis supplied.)

We do not read the plain language of § 25-2740(2) to result in the loss of subject matter jurisdiction simply due to the assignment of a county court judge to a case when the petitioner requested a district court judge. Although § 25-2740(2) permits a party to request a preference for a county court judge or a district court judge, there is nothing in the statute that requires the district court, where the matter is filed, to grant such a request. Nor is there any language in the statute which suggests that the failure to grant the petitioner's preference for a particular judge deprives the court of subject matter jurisdiction. As set forth previously, a court's subject matter jurisdiction derives from the constitutional and statutory sources of its authority, not the actions of the litigants that appear before it. See *Boyd v. Cook, supra.* Notably, Neb. Rev. Stat. § 24-517(7) (Cum. Supp. 2020) states that the county court shall have "[c]oncurrent original jurisdiction with the district court in domestic relations matters as defined in section 25-2740," which includes proceedings under § 28-311.11. There is no question the county court has subject matter jurisdiction over such domestic relations matters even though § 25-2740(2) requires that all such proceedings be "considered a district court proceeding, even if heard by a county court judge." Further, an "order or judgment of the county court in a domestic relations matter has the force and effect of a district court judgment." § 25-2740(2).

Stewart also asserts, without elaborating, that it is "not apparent from the record on appeal that the district and county courts issued an annual plan on case assignments in 2021" pursuant to Neb. Rev. Stat. § 24-312(3) (Reissue 2016) and, as a result, "jurisdiction may not have been invoked through that statute either." Brief for appellant at 9. Section 24-312(3) grants county court judges the authority to preside over domestic relations matters as defined by § 25-2740 pursuant to an annual plan submitted to the Nebraska Supreme Court for the distribution of domestic relations matters and Class IV felony cases between the district court and county court. Section 24-312(3) provides an alternative mechanism for domestic relations matters to be heard by a county court judge separate from § 25-2740. See *Mahmood v. Mahmud, supra* (petitioner's failure to request county court judge under § 25-2740 in petition for domestic abuse protection order did not deprive court of authority to subsequently issue harassment protection order; county court judge had authority under § 24-312(3) to issue protection order in accordance with annual plan submitted to Nebraska Supreme Court by district court and county court regarding domestic relations matters). As Stewart observes, the record on appeal does not contain any annual plan submitted by the district and county courts regarding the distribution of domestic relations matters. Regardless, the district court's order in this case states that jurisdiction arose through § 25-2740 and § 28-311.11, not § 24-312(3), and we have already concluded that there was subject matter jurisdiction under those statutes.

Although the precise mechanism that caused this case to be assigned to a county court judge is unclear on the record before us, the county court and district court had concurrent original jurisdiction in this matter, and § 25-2740 does not grant a petitioner the authority to prevent either court's exercise of that original jurisdiction.

Stewart also claims that the evidence was insufficient to support the entry of the sexual assault protection order in this case. We conclude otherwise.

A protection order is analogous to an injunction. *Elstun v. Elstun*, 257 Neb. 820, 600 N.W.2d 835 (1999). A party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle the claimant to relief. See *Abboud v. Lakeview, Inc.*, 237 Neb. 326, 466 N.W.2d 442 (1991). Accordingly, a party seeking a sexual assault protection order must prove a sexual assault offense by a preponderance of the evidence. *S.B. v. Pfeifler*, 26 Neb. App. 448, 920 N.W.2d 851 (2018).

Section 28-311.11(14) defines a "sexual assault offense" as:

(a) Conduct amounting to sexual assault under section 28-319 or 28-320, sexual abuse by a school employee under section 28-316.01, sexual assault of a child under section 28-319.01 or 28-320.01, or an attempt to commit any such offenses; or

(b) Subjecting or attempting to subject another person to sexual contact or sexual penetration without his or her consent, as such terms are defined in section 28-318.

The trial court's June 25, 2021, order boldfaced subpart (b) above and then proceeded to set forth portions of Neb. Rev. Stat. § 28-318 (Cum. Supp. 2020). We likewise focus our attention on those same statutory provisions. We will first address the evidence relevant to sexual contact, and we will then address the evidence relevant to consent.

The portion of § 28-318(5) relevant to this case defines "[s]exual contact" as:

[T]he intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts [genital area, groin, inner thighs, buttocks, or breasts, see § 28-318(2)]. Sexual contact also means the touching by the victim of the actor's sexual or intimate parts or the clothing covering the immediate area of the actor's sexual or intimate parts when such touching is intentionally caused by the actor. Sexual contact includes only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party.

The evidence concerning the events on May 11, 2021, presented different versions of what took place that evening. K.J. alleged that while in Stewart's vehicle, he "was groping [her] breasts and pinching [her] nipples" and that when told to do so by Stewart, she touched Stewart's penis because she was "frozen in fear" and she feared he would retaliate physically if she did not comply. K.J. claimed that once in Stewart's residence, he "proceeded to climb on top of [her]" when she was on his bed. Conversely, Stewart testified that no sexual contact ever occurred, and the only contact that happened between the two came about through "[i]ncidental touching" such as their hands brushing one another's.

Even on de novo review, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Torres v. Morales*, 287 Neb. 587, 843 N.W.2d 805 (2014). We apply this standard in this case, and we

give deference to the trial court's acceptance of K.J.'s version of the facts. Notably, the court specifically found that although K.J.'s testimony contained "a few inconsistencies, these discrepancies do not undermine her credibility in the Court's view regarding [Stewart's] actions against her." The court added that K.J. "did not appear to be embellishing or exaggerating her testimony and her demeanor during her testimony was genuinely distraught." Regarding Stewart, the court stated, "Sometimes, a party's credibility is impaired by demeanor, inconsistent statements and bias, and having heard the testimony of [Stewart] live, this Court finds it was not credible and further finds him to simply be untruthful." Giving deference to the court's findings, we also conclude that Stewart's acts of grabbing K.J.'s breasts, having her touch his penis, and climbing atop K.J. in bed could all reasonably be construed as being for the purpose of sexual arousal or gratification. Accordingly, there is sufficient evidence to support the conclusion that the attempted and actual sexual contacts described by K.J. occurred.

We next consider Stewart's argument that even if sexual contact occurred, there was "no evidence . . . presented showing that contact occurred without consent." Brief for appellant at 12. According to § 28-318(8), "[w]ithout consent" means:

> (a)(i) The victim was compelled to submit due to the use of force or threat of force or coercion, or (ii) the victim expressed a lack of consent through words, or (iii) the victim expressed a lack of consent through conduct, or (iv) the consent, if any was actually given, was the result of the actor's deception as to the identity of the actor or the nature or purpose of the act on the part of the actor;
>
> (b) The victim need only resist, either verbally or physically, so as to make the victim's refusal to consent genuine and real and so as to reasonably make known to the actor the victim's refusal to consent; and
>
> (c) A victim need not resist verbally or physically where it would be useless or futile to do so.

The Nebraska Supreme Court has held that in order to determine whether sexual contact occurred "'without consent' of the alleged victim, one of the four alternatives set forth in subsection (a) [of § 28-318(8)] must be shown." *State v. McCurdy*, 301 Neb. 343, 355, 918 N.W.2d 292, 301 (2018). Further, subsections (b) and (c) of § 28-318(8) "inform[] the nature of the proof necessary to show one of the definitions set forth in subsection (a)" and do not "set[] forth additional independent alternative means to show that sexual [contact] was 'without consent.'" See *State v. McCurdy*, 301 Neb. at 355, 918 N.W.2d at 301.

In addition, § 28-318(9), as relevant to this case, defines "[f]orce or threat of force" as "the use of physical force which overcomes the victim's resistance or . . . the threat of physical force, express or implied, against the victim . . . that places the victim in fear of death or in fear of serious personal injury . . . ."

Stewart argues that with respect to the contacts that occurred in his vehicle, K.J.'s testimony indicated that "no resistance existed for any physical force to overcome[,] and no evidence existed of any threat of physical force or coercion" by Stewart. Brief for appellant at 14, 16. Stewart further asserts that K.J.'s testimony likewise indicated that she first expressed her lack of consent only after Stewart proceeded to try to climb on top of her while in Stewart's bed, to

which Stewart complied. Stewart further notes that K.J. did not allege any further contact, attempted or otherwise, after she told Stewart "no" when he tried to climb on top of her.

Having reviewed the record in this case, we conclude that subsections (ii), (iii), and (iv) of § 28-318(8)(a) are not applicable to the facts before this court. K.J.'s testimony does not indicate that she expressed consent as a result of any deception by Stewart. Similarly, she testified that she did not resist or otherwise verbally express her lack of consent to any sexual contact until Stewart attempted to get on top of her in his bed, and he immediately removed himself from the bed and her person upon her saying "no." We conclude that this testimony indicates that she did not express a lack of consent through words or conduct prior to her saying "no," at which time, Stewart complied with her denial of consent.

The question then is whether K.J. "was compelled to submit due to the use of force or threat of force or coercion" as described by § 28-318(8)(a)(i). K.J.'s petition and testimony indicates that Stewart grabbed her breasts while she was in his vehicle without warning or other indication of intent while the vehicle was in motion. This contact caused her to feel "extremely uncomfortable and intimidated," and she described that her compliance and lack of resistance to this contact and further sexual contacts was due to her being "frozen with fear" of possible physical retaliation if she did not comply. K.J.'s perception of a threat of force was reasonable in light of the circumstances, as such unsolicited sexual contact demonstrates a willingness to violate the victim's intimate person and potentially cause serious bodily harm. Giving deference to the trial court that heard the parties' testimonies, see *Torres v. Morales, supra*, we determine the evidence was sufficient to prove by a preponderance of the evidence that K.J. was compelled to submit to these sexual contacts due to an implied threat of force. Accordingly, we find the evidence supported the entry of a sexual assault protection order.

CONCLUSION

For the reasons set forth above, we affirm the trial court's entry of a sexual assault protection order in this case.

AFFIRMED.