IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. KANDLER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JOSHUA C. KANDLER, APPELLANT.

Filed July 28, 2020.    No. A-19-720.

Appeal from the District Court for Lancaster County: LORI A. MARET, Judge. Affirmed.

Joseph D. Nigro, Lancaster County Public Defender, and Todd C. Molvar for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

PIRTLE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Following a jury trial, Joshua C. Kandler was convicted of incest, first degree sexual assault, and child abuse. The Lancaster County District Court subsequently imposed sentences of imprisonment. Kandler appeals his convictions and sentences. We affirm.

## II. BACKGROUND

In an amended information filed on January 3, 2019, the State charged Kandler with count 1, incest with a person under 18 years of age, a Class IIA felony, pursuant to Neb. Rev. Stat. § 28-703 (Reissue 2016); count 2, first degree sexual assault, a Class II felony, pursuant to Neb. Rev. Stat. § 28-319 (Reissue 2016); and count 3, child abuse, a Class IIIA felony, pursuant to Neb. Rev. Stat. § 28-707 (Reissue 2016). The crimes were alleged to have occurred between January 1 and September 30, 2017. The named victim in each count was Kandler's stepdaughter, A.T., born in February 2001.

A jury trial was held in May 2019. Although numerous witnesses testified and many exhibits were received into evidence, we include only that which is necessary to dispose of the issues raised on appeal. We give a summary of that evidence here. Additional details will be provided as necessary in the analysis.

Kandler began dating A.T.'s mother when A.T. was 3 or 4 years old, and they got married when A.T. was 5 years old; Kandler and A.T.'s mother went on to have three children together. When A.T. and her mother lived with Kandler, Kandler was the main disciplinarian. His disciplinary techniques involved yelling, spanking when A.T. was young, slapping her face once when she was in kindergarten, giving A.T. hot sauce for lying once when she was in elementary school, threatening military school when she was in middle school, and pinching her throat once (Kandler denied pinching her throat). A.T. also testified that one time Kandler threw their puppy down on the floor and it had to have a cast put on its leg. A.T. testified that she used to love Kandler, then began to fear him when he became aggressive.

In 2014, the relationship between Kandler and A.T.'s mother deteriorated, and A.T. and her mother moved out of the residence they shared with Kandler; A.T.'s three brothers continued to reside with Kandler. A.T. testified that she had always thought of Kandler as a father, and continued to have visitations with him every other weekend until the fall of 2017.

A.T. testified that after Kandler and her mother separated, Kandler became a nicer person and the "dad [she] wanted him to be." She said Kandler told her that he had an aneurysm and that his doctor told him he only had a certain amount of time to live. In his testimony, Kandler admitted that he told people he had an aneurysm, and that while he never got an official diagnosis because he could not afford the testing, he spoke to his family practitioner who "told [him] that it's more than likely what had happened, that things can exacerbate . . . it, [and] that it more than likely will lead to a shorter life span." A.T. testified that after the aneurysm, Kandler had constant headaches and she felt bad for him.

A.T. confirmed that in 2017, she and Kandler began to discuss sexual topics during her visits. She said it was "bound to happen eventually" because "fathers talk to their daughters and sons about sex." When asked if Kandler ever told her the purpose of the discussions, A.T. responded, "It was so I could learn, you know, like, learn more about what sex really was to people, . . . [l]earn how to . . . have sex properly, I suppose." A.T. said that she and Kandler had discussions about sex "[a]lmost every other weekend when [she] was there." One of the discussions was about "how to please your partner." She said they also talked about oral sex, "hand jobs," "bondage or being restrained," "butt plugs," "dildos," and vibrators; they watched "anime pornography" once on his laptop. In the beginning, there was no physical contact between A.T. and Kandler.

According to A.T., no physical contact occurred until after her 16th birthday in February 2017. She then testified about the progression of physical acts that occurred until September 2017. The first physical incident she described was when Kandler asked her to demonstrate "how a woman could grind on a man without any clothes on"; they were both undressed and she "rubbed" her "vagina" on Kandler's thigh while he held her hips. A.T. said she trusted Kandler and thought "him teaching [her] these things would be . . . innocent enough . . . [and] all these things would . . . just be a normal thing for a father to do for his daughter." Kandler testified differently, claiming that he had fallen asleep in a chair one night after drinking some alcohol and woke up to A.T. grinding on him; they were both wearing robes at the time and he said he immediately pushed her

away. During his police interview, Kandler said they were both wearing robes and he "was almost passed out," and was "really drunk and [he] didn't realize what was going on and she was rubbing on [his penis] and [he] put a stop to it as soon as [he] figured out what . . . was going on."

A.T. testified that during other "sessions" Kandler had her demonstrate a "blow job" on him. She attempted this once or twice, but stopped after "a couple of minutes" because she started to feel uncomfortable and she did not like the taste of Kandler's penis, "[i]t tasted very bitter." She also tried to perform "hand jobs" once or twice following Kandler's instructions. Later on, Kandler used "butt plugs," "dildos," and vibrators with her. She testified that he gifted her several sex toys, pictures of which were received into evidence. However, Kandler and a former girlfriend testified that the sex toys were either gifted to the girlfriend or previously owned by Kandler. And Kandler testified that he only told A.T. the "most cutdown version" of what the sex toys were for after she found them in his "toy box" and inquired about them; he denied ever using the sex toys on A.T. A.T. testified that prior to ending her visits with Kandler in September 2017, he "lick[ed]" her vagina, and he penetrated her vagina and anus with his fingers, sex toys, and his penis. She said they used the "restraints" on Kandler's bed on one occasion while he digitally penetrated her and "licked" her vagina; Kandler testified that he is involved in the "BDS&M" lifestyle. A.T. testified that she was "willing to experiment" because she was "trusting of [Kandler]" and "[h]e was teaching [her]." She also said that "a lot of these sessions ended when [she] orgasmed."

Throughout her testimony, A.T. repeatedly stated that she participated in the "sessions" because she did not want to disappoint Kandler or make him sad; however, she confirmed that he never told her he would be disappointed or sad. A.T. also testified that she did not want the sessions to stop at first because they were "satisfying" and gave her something to look forward to when she went to Kandler's house. She said the sessions got more spaced out toward the end "[b]ecause there was really nothing else to teach me, you know. Like, we were just doing the same routine, you know. And there was really nothing to teach me at that point." A.T. testified that she asked Kandler if she was still a virgin, and he told her she had "graduated, and that [they] were done with the sessions." A.T. viewed Kandler as a stepfather and a teacher, but also saw him as a boyfriend. A.T. stopped going to Kandler's house in the fall of 2017.

A.T. testified that "after the whole sessions thing," she was diagnosed with depression, "PTSD," and anxiety. In her 2017 counseling sessions, A.T. did not tell her counselor about what had happened with Kandler.

A.T.'s mother testified that she took A.T. to see a counselor in the spring or summer of 2017 because A.T. was having issues in school and claimed to have trouble concentrating. A.T.'s mother also noticed that A.T. would "talk out loud to who she called her imaginary friends." A.T.'s mother said, "[A.T.] always had kind of a thing to [sic] talking to imaginary friends, but it's something that I noticed kind of picked up, and actually got more frequent, and she would do it in public." A.T.'s mother testified that A.T. was diagnosed with depression after she began counseling. Additionally, A.T. was later diagnosed with "PTSD" by a different provider.

In January 2018, A.T. told her biological father and mother about what had happened with Kandler and the police were contacted. A.T. was subsequently interviewed at the Child Advocacy Center (CAC).

Dr. Barbara Sturgis is a clinical psychologist. Dr. Sturgis never interviewed A.T., but testified generally about child sexual abuse. According to Dr. Sturgis, children are dependent on

family members for physical support, nurturance, affection, and attention. And "we train kids to obey grownups." When asked why a child would "put up with sexual abuse for an extended period of time," Dr. Sturgis said reasons can include fear and guilt. Additionally, the child can "value the relationship beyond anything else, and so they're willing to go along with it, and sometimes the sexual abuse feels good"; "[t]his can be accidental, or it can be a deliberate attempt on the part of the perpetrator to engage the child in the sexual behavior and also it maintains secrecy, because then essentially the child feels they would be telling on themselves." She said children can feel guilty if sexual abuse felt good or if they enjoyed it. She also said that if something happens more than once in more or less the same way, the incidents "tend to blend together" and recalling specific details from different times can be difficult.

Kandler testified that he and A.T. had numerous discussions about sex because he had an open and honest policy and would answer any questions she had. Kandler always let A.T. initiate the questions and "[s]he was in charge of any questions she asked"; he answered anything she asked, including questions about "blow jobs," "hand jobs," masturbation, and cunnilingus. Kandler explained sex toys along with sexual apparatuses to A.T. when she found them in his basement. After Kandler found A.T. watching "anime porn," he "gave her a website that was less infected with viruses, because the ones she was using was tripping the virus scan." He said he did not watch pornography with A.T., but just told her what to type in and "let her have at it." He denied ever having any physical contact of a sexual nature with A.T. During his police interview, he said he "does drink," and was "hoping that nothing happened when [he] was drunk"; at trial he agreed he was specifically referring to the grinding incident. At trial Kandler did admit that he had pointed out various body parts on both himself and A.T. while they were undressed. He explained that he is a nudist and he allows his children to be nude if they choose; he said it is not uncommon in his house for people to be wearing just a robe.

The jury found Kandler guilty of all three counts. The district court subsequently sentenced Kandler to 19 to 20 years' imprisonment on count 1 (incest), 49 to 50 years' imprisonment on count 2 (first degree sexual assault), and 3 to 3 years' imprisonment on count 3 (child abuse); all sentences to be served consecutively. Kandler was given credit for 511 days served.

Kandler appeals.

## III. ASSIGNMENTS OF ERROR

Kandler assigns, reordered, that (1) the district court erred by denying his strikes for cause during voir dire, (2) the district court erred by not admitting a video interview into evidence, (3) prosecutorial misconduct prejudiced his right to a fair trial, (4) there was insufficient evidence to sustain his convictions, and (5) the district court imposed excessive sentences.

## IV. STANDARD OF REVIEW

The retention or rejection of a juror is a matter of discretion for the trial court. *State v. Huff*, 298 Neb. 522, 905 N.W.2d 59 (2017).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Lee*, 304 Neb. 252, 934 N.W.2d 145 (2019). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial

court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Lee, supra*.

When a defendant has not preserved a claim of prosecutorial misconduct for direct appeal, we will review the record only for plain error. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *Id*.

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Guzman*, 305 Neb. 376, 940 N.W.2d 552 (2020).

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *Id*.

## V. ANALYSIS

### 1. MOTION TO STRIKE JURORS

Kandler argues that the district court erred by failing to strike six jurors for cause. He claims that those jurors indicated that they could not be fair and impartial. However, only two of those jurors, J.R. and D.B., ultimately sat on the jury that decided the case.

As stated previously, the decision to retain or reject a venireperson as a juror rests in the trial court's discretion. *State v. Huff, supra*. Even if the trial court erroneously overrules a challenge for cause, we will not reverse the court's decision unless the defendant can show that an objectionable juror sat on the jury after the defendant exhausted his or her peremptory challenges. *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011).

Although Kandler's peremptory challenges do not appear in our record, Kandler claims "he did not have enough peremptory challenges to remove . . . biased jurors" D.B. and J.R. Brief for appellant at 44. And the State contends that "[i]t appears from the size of the venire and the size of the jury that Kandler used all of his peremptory challenges." Brief for appellee at 25. Assuming that Kandler did in fact use all of his peremptory challenges, we will consider the district court's decision to retain jurors J.R and D.B., the only two challenged venirepersons to sit on the jury.

During voir dire, J.R. stated she was sexually assaulted by a relative when she was a child. When asked by the State if, despite her life experience, she could give the defense a fair trial, J.R. responded, "I believe so."

During voir dire, D.B. stated that he believes in the presumption of innocence, but that he would be more inclined to believe a child who said something happened. D.B. also indicated that after hearing the charges, he believed the defendant was guilty. When asked if he felt like it is the

defense's job to prove the defendant is not guilty, D.B. responded, "I know legally it's not, but I think to me, I might see it that way."

After the foregoing occurred, defense counsel explained to the venire the presumption of innocence, and that it is the State's burden to prove the charges beyond a reasonable doubt. After more exchanges with the venire, defense counsel moved to strike several potential jurors for cause, including J.R. and D.B. The district court stated it was not inclined to strike J.R., D.B., or another named person, based on what it heard.

The district court then gave the venire a number of instructions, including that it was their duty to not allow prejudice to influence them and to not make up their minds until the case was submitted for verdict, and that Kandler was presumed innocent until the State proved beyond a reasonable doubt that he was guilty of the crimes charged. After it finished giving instructions, the court asked the venire:

> Showing me by a show of hands, is there anyone here who will not follow the law? Is there anyone here who will not listen to the instructions given by the Court and apply them to the facts that are presented during the case? Is there anyone here who will not be a fair and impartial juror?

Apparently neither J.R. nor D.B. raised their hands because the court did not continue to question them as it did other venirepersons. Defense counsel renewed its motion to strike certain potential jurors, including J.R. and D.B., for cause, but the court overruled counsel's challenges for cause.

Neb. Rev. Stat. § 29-2006 (Cum. Supp. 2018) establishes when jurors in a criminal trial may be challenged for cause. Under this statute, dismissal is mandatory only if the prospective juror has formed an opinion about the defendant's guilt or innocence based on "conversations with witnesses of the transactions or reading reports of their testimony or hearing them testify." *State v. Dixon*, 282 Neb. at 283, 802 N.W.2d at 878. We give deference to a trial court's determination of whether a prospective juror can apply the laws impartially. *State v. Dixon, supra*. Here, the district court did not abuse its discretion when it did not strike J.R. and D.B. for cause.

## 2. EXCLUDED EVIDENCE

Kandler argues the district court abused its discretion by not admitting into evidence exhibit 47, the video of A.T.'s CAC interview. Prior to trial, the State filed a motion in limine seeking, in part, to preclude the defense from arguing, adducing evidence, or in any way commenting, during opening statement, cross-examination, direct examination, or closing argument on "[a]ny evidence of the character, or evidence of a pertinent trait of character, of the alleged victim A.T. unless the defendant has first made a showing outside the presence of the jury that such evidence is admissible." That motion was sustained.

During trial, Maja Cartwright testified that she was currently the program director at the CAC, and prior to that was a forensic interviewer. She described the CAC as "a center where children who have allegations of child abuse, primarily child sexual abuse, come . . . to get services such as a forensic interview, advocacy, and case coordination." Cartwright also described the process and protocol for forensic interviews. She stated that during forensic interviewers, interviewers do not push for a disclosure of abuse, but that once a disclosure is made the

interviewer does push on the details. Additionally, in her experience, every child reacts differently during a disclosure.

Cartwright interviewed A.T. on January 29, 2018, when A.T. was 16 years old. The interview was recorded, and law enforcement watched the interview from a different room. During the interview, A.T. made certain disclosures and was able to provide details; Cartwright did not elaborate on what A.T. disclosed or what detail was provided. According to Cartwright, A.T.'s demeanor changed throughout the interview; at times A.T. seemed happy and laughed, other times A.T. cried and seemed "either anxious or nervous and angry, also." Cartwright confirmed it was not unusual for demeanor to change throughout an interview.

At trial the next day, additional witnesses testified. Then, after the lunch recess, several matters were taken up outside the presence of the jury. At that time the State said it had a motion in limine that it would like to address. The following colloquy was had on the record.

> [The prosecutor]: . . . . I have one quick Motion in Limine I'd also like to address.
>
> THE COURT: All right.
>
> [The prosecutor]: Your Honor, with regards to my Motion in Limine, it's come to my attention that [defense counsel] is going to try to attempt to introduce into evidence the transcript of the CAC interview of [A.T.].
>
> Obviously, we -- through Investigator [Chris] Champoux, the State would contend first of all, it's improper foundation, but more importantly that it is hearsay in its entirety.
>
> Rather than -- we feel that his offer in front of the jury would be prejudicial, by making us object to that. We would ask the Court to go ahead and rule upon that so that offer is not made in front of the jury.
>
> In the event your Honor sustains our objection and even if you overrule it, then obviously he'd be free to do it in front of the jury, but we would request a ruling on the matter now, outside the presence of the jury so that it's not made there, in the event you do sustain our objection.
>
> . . . .
>
> [Defense Counsel]: . . . . I do intend to lay some foundation with Investigator Champoux, who I believe was present for that interview, witnessed that entire interview, and well, may or may not have reviewed that video prior to court. I don't know the answer to that at this point.
>
> Based on Maja Cartwright's testimony yesterday, she was asked about [A.T.'s] demeanor during that interview. Ms. Cartwright did testify as to that. I asked Ms. Cartwright, also if she had pushed [A.T.] on her answers. She did say she did.
>
> I would offer it for the purpose of showing the jury firsthand, through the video, what [A.T.'s] demeanor was. I understand that can be considered hearsay. It's not offered for that purpose. It is offered to show the jury her demeanor and to corroborate or not corroborate Ms. Cartwright's testimony as to her interview with [A.T.].
>
> THE COURT: Both [A.T.] and Ms. Cartwright testified; correct?
>
> [Defense Counsel]: Correct.
>
> THE COURT: Anything else you want to say on that?
>
> [The prosecutor]: Your Honor, I'd submit that the information or what he was seeking could be addressed through cross-examination and is not a sufficient basis to

overcome the fact that it is hearsay and would not be admissible. We would still standby the objection that it is inadmissible based upon foundation and hearsay.

THE COURT: I'm going to overrule any motion to offer a transcript or a video . . . of the CAC video of [A.T.]

[Defense Counsel]: Judge, can I have it marked and offer it as an offer of proof?

[The prosecutor]: So clarification, you're sustaining my objection?

THE COURT: Right. I'm overruling his offer, sustaining your Motion in Limine.

. . . .

[Defense Counsel]: I'd offer Exhibit 47 for the sole purpose of offer of proof.

THE COURT: For purpose of offer of proof?

[The prosecutor]: For the purpose of offer of proof, no objection.

THE COURT: It's received for offer of proof.

The foregoing took place before the jury was brought back into the courtroom and before Investigator Champoux was called to the stand to testify. Defense counsel did not attempt to offer exhibit 47 into evidence while in the presence of the jury.

In his brief on appeal, Kandler argues that the video was admissible pursuant to Neb. Evid. R. 106, Neb. Rev. Stat. § 27-106 (Reissue 2016), which provides:

(1) When part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other. When a letter is read, all other letters on the same subject between the same parties may be given. When a detached act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence.

(2) The judge may in his discretion either require the party thus introducing part of a total communication to introduce at that time such other parts as ought in fairness to be considered contemporaneously with it, or may permit another party to do so at that time.

Kandler contends the CAC interview explained Cartwright's previous testimony regarding A.T.'s demeanor, placed Cartwright's testimony in context regarding whether she pushed A.T. on her answers, and would avoid misleading the jury and ensure a fair and impartial understanding by the jury. The State contends that Kandler did not rely on rule 106 in the district court and cannot do so for the first time on appeal. See *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013). While rule 106 was not raised before the district court, the admissibility of the recorded interview was raised.

We find no abuse of discretion in the district court's determination that the video of A.T.'s CAC interview was not admissible. Cartwright confirmed that she did push A.T. on the details of her disclosure, but Cartwright never testified about what disclosures were made by A.T. or what details were provided. And while Cartwright also testified as to A.T.'s demeanor during the interview, such testimony was based on Cartwright's observation and impression; Kandler had the opportunity to challenge this testimony on cross-examination. Furthermore, the jury itself had the opportunity to observe A.T.'s demeanor when she testified earlier during the trial about what transpired between her and Kandler. Kandler does not contest that the CAC video contained

hearsay, but argues it was nonetheless admissible. However, we find no abuse of discretion in the district court's decision to not allow the video into evidence.

### 3. Prosecutorial Misconduct

Kandler contends the prosecutor committed misconduct during closing arguments by (1) incorrectly instructing the jury on the law--specifically the prosecutor "did not define 'coercion' as per Jury Instruction No. 4, but used dicta [from case law]," brief for appellant at 48; (2) misstating the evidence admitted at trial--specifically that the prosecutor repeatedly stated Kandler's "'aunt had taught him about sex,'" when he only testified that his aunt gave him a Playboy magazine, *id.* at 49; and (3) asking the jury to place themselves in the shoes of others. Kandler further contends that the prosecutorial misconduct prejudiced his right to a fair trial.

A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). In assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. *Id.* It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial. *Id.*

In order to preserve, as a ground of appeal, an opponent's misconduct during closing argument, the aggrieved party must have objected to improper remarks no later than at the conclusion of the argument. *State v. Cullen*, 292 Neb. 30, 870 N.W.2d 784 (2015).

During closing arguments, Kandler made only one objection, and it was after one statement by the prosecutor that, "That's how [Kandler's] aunt had taught him about sex"; the basis for Kandler's objection was "facts not in evidence." The objection was overruled. Kandler made no other objections during the prosecutor's closing argument. Thus, the foregoing is the only allegedly improper remark preserved for appellate review.

Kandler claims the prosecutor "misstated the actual evidence admitted at trial," and "[t]he jury was misled or unduly influenced by prosecutorial misconduct because it stated that [Kandler's] 'aunt had taught him about sex.'" Brief for appellant at 48. The specific language quoted by Kandler as being problematic--that his aunt taught him about sex--is supported by evidence in the record. A.T. testified that Kandler told her his aunt taught him about sex. And when Kandler himself was asked what sort of sexual education he received from his aunt, he responded, "My aunt bought me a[] *Playboy,* and said, these are not real women. Don't belief [sic] a single word of the stories. Never make the first move." Thus, the specific language complained of in his brief--that his aunt taught him about sex--does not misstate the actual evidence at trial. To the extent he claims error to other language during closing arguments about what his aunt taught him, he does not specifically argue that language. See *State v. Thomas*, 303 Neb. 964, 932 N.W.2d 713 (2019) (alleged error must be both specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court).

During closing arguments, Kandler did not object to any statements by the prosecutor as to the definition of "coercion" or the prosecutor asking the jury to place themselves in the shoes of others. Because Kandler did not timely object to those allegedly improper remarks by the prosecutor, we review those statements only for plain error. See *State v. Cullen, supra.*

In this case, before the opening statements were given, the district court informed the jury that the attorneys would be commenting on the testimony and evidence presented at trial,

"however, if their recollection of the evidence differs from your recollection, you must follow your own recollection." After closing arguments, the district court formally instructed the jury. Included in those instructions, and as relevant here, were: It was their duty to decide what the facts were relying solely upon the evidence in the trial; statements and arguments of the lawyers for the State were not evidence; they "must not allow sympathy or prejudice to influence [their] verdict"; and the definition of "coercion."

Having reviewed Kandler's claim regarding prosecutorial misconduct for plain error, we find none.

### 4. SUFFICIENCY OF EVIDENCE

Kandler contends the evidence adduced at trial was not sufficient to support his convictions. He argues, in part, "The state's case rested entirely upon [A.T.'s] testimony," and "[A.T.'s] statements continually changed throughout the investigation and at trial . . . making her testimony not credible." Brief for appellant at 30. He points out several "contradictions" by A.T. regarding specific incidences, including when and where (what room) they occurred, and who was home at the time. *Id*.

However, in reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Guzman*, 305 Neb. 376, 940 N.W.2d 552 (2020). When a criminal defendant challenges the sufficiency of the evidence upon which a conviction is based, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

### (a) Incest

Section § 28-703(1) provides, in relevant part, that "any person who engages in sexual penetration with his or her stepchild who is under nineteen years of age commits incest." If the incest is with a person who is under 18 years of age, it is a Class IIA felony. See § 28-703(2). Neb. Rev. Stat. § 28-318(6) (Reissue 2016) defines "[s]exual penetration" as

> sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical or nonhealth purposes.

With respect to the incest conviction, Kandler simply attacks the credibility of A.T. But an appellate court does not pass on the credibility of witnesses or reweigh the evidence; such matters are for the finder of fact. *State v. Guzman, supra*.

According to the testimony and evidence at trial, A.T. was Kandler's stepdaughter, and she was born in February 2001, making her under 18 years of age in 2017. A.T. made it clear that nothing physical happened between her and Kandler until "after" her 16th birthday in February 2017, and that she stopped having visits with him at the end of September that same year. According to A.T.'s testimony, during that timeframe she had Kandler's penis in her mouth, he "lick[ed]" her vagina, and he penetrated her vagina and anus with his fingers, sex toys, and his

penis. Viewing the evidence in the light most favorable to the State, there was sufficient evidence to convict Kandler of incest.

### (b) First Degree Sexual Assault

Section 28-319(1) provides, in relevant part:

Any person who subjects another person to sexual penetration (a) without the consent of the victim, . . . or (c) when the actor is nineteen years of age or older and the victim is at least twelve but less than sixteen years of age is guilty of sexual assault in the first degree.

Because A.T. testified that nothing physical happened between her and Kandler until "after" her 16th birthday, we will focus our analysis on whether there was sufficient evidence to support a conviction under § 28-319(1)(a).

As set forth previously, A.T. testified that Kandler subjected her to sexual penetration. The question is whether such penetration occurred without her consent. Pursuant to § 28-318(8),

Without consent means:

(a)(i) The victim was compelled to submit due to the use of force or threat of force or coercion, or (ii) the victim expressed a lack of consent through words, or (iii) the victim expressed a lack of consent through conduct, or (iv) the consent, if any was actually given, was the result of the actor's deception as to the identity of the actor or the nature or purpose of the act on the part of the actor[.]

See, also, *State v. McCurdy*, 301 Neb. 343, 918 N.W.2d 292 (2018) (in order to determine whether sexual activity was "without consent" of the alleged victim, one of the four alternatives set forth in subsection § 28-318(8)(a) must be shown).

Based on A.T.'s testimony, she did not express a lack of consent through words or conduct. Therefore, there was no evidence that sexual penetration was "without consent" within the meanings set forth in § 28-318(8)(a)(ii) or (iii). Having eliminated § 28-318(8)(a)(ii) and (iii), we consider whether the evidence supports a finding of "without consent" within the meanings of § 28-318(8)(a)(i) and (iv).

### (i) § 28-318(8)(a)(i)

For the sexual penetration to be "without consent" pursuant to § 28-318(8)(a)(i), there must be "use of force or threat of force or coercion." A.T.'s testimony does not indicate any force or threat of force. The parties disagree on whether Kandler subjected A.T. to sexual penetration through coercion.

"Coercion," as used in § 28-318(8)(a)(i), is not statutorily defined in § 28-318 or elsewhere. *State v. McCurdy, supra*. However, the Nebraska Supreme Court has held that "coercion" in § 28-318(8)(a)(i) includes nonphysical force. *State v. McCurdy, supra*. The Nebraska Supreme Court also stated, "We . . . think that under a totality of the circumstances analysis, coercion within the context of a family or household relationship between a minor and an adult authority figure can support a finding that a defendant compelled a victim to submit to sexual penetration by the use of 'coercion.'" *Id.* at 363, 918 N.W.2d at 305.

In *State v. McCurdy, supra*, the charge of first degree sexual assault involved McCurdy subjecting J.U. to sexual penetration when she was over 16 years of age. J.U., who was 18 years old at the time of trial, was the daughter of McCurdy's former girlfriend. J.U.'s mother and McCurdy had been in a long-term romantic relationship, and they shared three children together. McCurdy had been in J.U.'s life for as long as she could remember and he had been sexually abusing her for a number of years, both before and after she turned 16 years old. McCurdy did not dispute that he had sexual intercourse with J.U. when she was 16 and 17 years old, but contended that his sexual relationship with J.U. at that time was consensual. He admitted that at the time he was arrested, J.U. was pregnant with his child. J.U. testified that when McCurdy first began sexually assaulting her, she would tell him "'"no"'" and try to push him away but that she eventually stopped resisting, because "'"he still did it anyway."'" *State v. McCurdy*, 301 Neb. at 363, 918 N.W.2d at 305. She also testified that after she turned 16 years old, she did not want to have sex with McCurdy but she knew that resisting his advances had never worked for her. The Nebraska Supreme Court found that evidence of a history of sexually assaulting J.U. combined with the authority McCurdy exerted as an adult in J.U.'s household were sufficient to establish "coercion" under § 28-318(8)(a)(i), and that the jury could have found that McCurdy subjected J.U. to sexual penetration "without consent"; specifically, he compelled J.U. to submit to sexual penetration by use of coercion.

Similar to the facts in *McCurdy*, Kandler had been in A.T.'s life for as long as she could remember and Kandler exhibited authority as an adult in A.T.'s household, including being the main disciplinarian when she was growing up. Unlike in *McCurdy*, the sexual abuse at issue had not been going on for a number of years, rather it occurred over a period of about 6 months. All physical contact occurred after A.T. turned 16 years old, and there is no evidence that A.T. actively tried to resist or that Kandler did not stop if she was uncomfortable with something.

Kandler believes that the facts of this case are too distinguishable from *McCurdy* to find that any actions in this case constituted coercion. The State contends that the evidence in this case showed "the evolution of their relationship and the psychological pressures that were brought to bear on A.T. and compelled her to submit to the sexual penetration." Brief for appellee at 22.

Viewing the evidence in the light most favorable to the State, the jury could have found that Kandler subjected A.T. to sexual penetration "without consent"; specifically, he compelled A.T. to submit to sexual penetration by use of coercion. See *State v. Guzman*, 305 Neb. 376, 940 N.W.2d 552 (2020) (relevant question for appellate court is whether, after viewing evidence in light most favorable to prosecution, any rational trier of fact could have found essential elements of crime beyond reasonable doubt).

However, even if the evidence in this case was not sufficient to find that Kandler subjected A.T. to sexual penetration by coercion, that is not the only meaning of "without consent" to be considered in this case.

*(ii) § 28-318(8)(a)(iv)*

Kandler does not address whether any sexual penetration was "without consent" within the meaning of § 28-318(8)(a)(iv). However, the State argues that under this subsection, there was sufficient evidence to show that consent, if any was actually given, was the result of the actor's deception as to the nature or purpose of the act on the part of the actor. We agree.

A.T.'s testimony was that Kandler had "sessions" with her in order to teach her about sex and how to please a partner. According to A.T., when she asked Kandler if she was still a virgin, he told her she had "graduated, and that [they] were done with the sessions." In addition to A.T.'s testimony, the recording of a "controlled call" between A.T. and Kandler in January 2018 shows, in part, that A.T. asked, "Isn't what we did kind of like what, just, people who are in love, like husband and wives do?" And Kandler responded, "Not when it comes to teaching. Okay?"

Viewing the evidence in the light most favorable to the State, the jury could have found that Kandler subjected A.T. to sexual penetration "without consent"; specifically, her consent was the result of Kandler's deception as to the nature or purpose of the act. Accordingly, there was sufficient evidence to support Kandler's conviction of first degree sexual assault.

### (c) Child Abuse

At the time of the offense in this case, § 28-707 provided, in relevant part:

(1) A person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be:

(a) Placed in a situation that endangers his or her life or physical or mental health;

. . . .

(d) Placed in a situation to be sexually exploited by allowing, encouraging, or forcing such minor child to solicit for or engage in prostitution, debauchery, public indecency, or obscene or pornographic photography, films, or depictions;

(e) Placed in a situation to be sexually abused as defined in section 28-319, 28-319.01, or 28-320.01; or

. . . .

(4) Child abuse is a Class IIIA felony if the offense is committed knowingly and intentionally and does not result in serious bodily injury as defined in section 28-109 or death.

"Debauchery" is defined as "[e]xcessive indulgence in sensual pleasures; sexual immorality or excesses." Black's Law Dictionary 486 (10th ed. 2014). See, also, *Joyce S. v. Frank S.*, 6 Neb. App. 23, 571 N.W.2d 801 (1997), *disapproved on other grounds, Betz v. Betz*, 254 Neb. 341, 575 N.W.2d 406 (1998) (providing definitions of debauchery).

Based on A.T.'s testimony, Kandler knowingly, intentionally, or negligently allowed or encouraged her to engage in an incestuous relationship with him when she was 16 years old. A rational trier of fact could have found that the incestuous relationship constituted debauchery, or sexual immorality. Additionally, a rational trier of fact could also have found that the incestuous relationship placed A.T. in a situation that endangered her mental health. Furthermore, a rational trier of fact could have found that Kandler knowingly, intentionally, or negligently placed A.T. in a situation to be sexually abused as defined in § 28-319. Accordingly, viewing the evidence in the light most favorable to the State, there was sufficient evidence to convict Kandler of child abuse.

## 5. Excessive Sentence

Kandler was convicted of count 1, incest with a person under 18 years of age, a Class IIA felony; count 2, first degree sexual assault, a Class II felony; and count 3, child abuse, a Class IIIA felony. Kandler was sentenced to 19 to 20 years' imprisonment on count 1, 49 to 50 years' imprecreation on count 2, and 3 to 3 years' imprisonment on count 3; all sentences to be served consecutively. Kandler was given credit for 511 days served.

The Class II felony was punishable by 1 to 50 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2018). The Class IIA felony was punishable by up to 20 years' imprisonment. See *id*. And the Class IIIA felony was punishable by up to 3 years' imprisonment, a $10,000 fine, or both. See *id*. (any person sentenced to imprisonment for a Class I, IA, IB, IC, ID, II, or IIA felony and sentenced concurrently or consecutively to imprisonment for a Class III, IIIA, or IV felony shall not be subject to post-release supervision). Kandler's sentences were within the statutory range.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Guzman, supra*. In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Kandler was 42 years old at the time of sentencing. According to the presentence report, Kandler had been separated from A.T.'s mother since 2014, had three sons and a stepdaughter (A.T.), had completed high school, and was employed prior to his arrest. Kandler's prior criminal history includes only a fine for "Fail to Yield to Vehicle Turning Left" in 2015. The nature of the current offenses has been set forth previously.

The probation officer conducted a "Level of Service/Case Management Inventory." Kandler was assessed as an overall "medium low" risk to reoffend. He scored "high risk" in the criminogenic risk factor domain for family/marital. He scored "medium risk" in the domains for leisure/recreation and antisocial pattern. He scored "low risk" in the domains for education/employment, companions, alcohol/drug problem, and procriminal attitude/orientation. And he scored "very low risk" in the domain for criminal history. On the "Vermont Assessment of Sex Offender Risk," used to determine the appropriateness of a defendant convicted of a sex offense for community supervision, Kandler scored "in the low risk range."

At the sentencing hearing, Kandler's counsel stated that Kandler maintained his innocence. Counsel noted that Kandler had "essentially no criminal history," and asked the court to consider leniency. Kandler personally addressed the court stating, "I still maintain my innocence. I will keep fighting to prove it until I'm free, or the State has my corpse to deal with." Kandler asked "for justice" not only for himself, "but for the four other people [his three sons and his former

girlfriend] whose lives were irrevocably damaged by this cruel lie." The State argued that Kandler had "little, if any, rehabilitative potential" because of his denials of any wrongdoing and because his family and friends do not hold him accountable. The State further argued this was "not a single occurrence of bad judgment or drunken stupor," but was "a case of grooming that [took] place over time, and then the repeated and planned sexual assaults of a vulnerable teenager." The State also noted that Kandler "attempted to continue manipulation and coercion of [A.T.] in the courtroom, in front of this Court and the jury . . . as she [was] testifying from the stand"; Kandler mouthed "please" and "I still love you." The State requested a "lengthy" period of incarceration.

The district court stated that it had considered the relevant sentencing factors. In addressing Kandler, the court said Kandler had "stolen any chance of a possibility for [A.T.] to have a normal, healthy relationship with another person of the opposite sex." The court continued:

> During the trial, you continued your attempts of manipulation, power, and control by mouthing words to the victim, as she testified on the stand, and when she passed in front of you during a break.
>
> You seemed to have had a need to find some normalcy, some normal reason for your perversions by declaring that you were a nudist, you were raised by nudists, you were taught by an aunt about sex, and by being an educator and proponent of the BDS&M lifestyle, all culminating in you attributing consent and maturity to a child to partake in these choices; all under the guides [sic] of insuring [sic] her safety for such activity in the future. All the while satisfying your own personal needs. You are the definition of selfishness.

The court found that imprisonment was necessary and sentenced Kandler as set forth previously.

In his brief, Kandler contends that his sentence was an abuse of discretion because the district court failed to consider or give adequate weight to a number of factors, including Kandler's "family ties, his willingness to work at honest labor, his social and cultural background, his lack of a past criminal record, his potential for reform, the unlikelihood of recidivism, and his health problems [not only his aneurysm, but his experiencing of panic attacks, depression, and anxiety while imprisoned]." Brief for appellant at 39. Kandler also contends the district court punished him more harshly because of his "alternative lifestyle." *Id.* at 41.

Having considered the relevant factors in this case, we find Kandler's sentences are not excessive or an abuse of discretion and his sentences are therefore affirmed. See *State v. Guzman*, 305 Neb. 376, 940 N.W.2d 552 (2020) (sentence imposed within statutory limits will not be disturbed on appeal absent abuse of discretion by trial court).

## VI. CONCLUSION

For the reasons stated above, we affirm Kandler's convictions and sentences.

AFFIRMED.